# EXHIBIT A

| **To:** | Unstoppable Domains, Inc. (nyustmp@ladas.com) |
|---|---|
| **Subject:** | U.S. Trademark Application Serial No. 88807913 - .WALLET - 1T20731075 |
| **Sent:** | May 28, 2021 02:00:56 PM |
| **Sent As:** | ecom113@uspto.gov |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |
| | Attachment - 33 |
| | Attachment - 34 |
| | Attachment - 35 |
| | Attachment - 36 |
| | Attachment - 37 |
| | Attachment - 38 |
| | Attachment - 39 |
| | Attachment - 40 |
| | Attachment - 41 |

**United States Patent and Trademark Office (USPTO)**
**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application
Serial No.**
88807913

**Mark:** .WALLET

**Correspondence
Address:**
Dennis S. Prahl
LADAS & PARRY
LLP
1040 AVENUE OF
THE AMERICAS
NEW YORK NY
10018-3738

**Applicant:**
Unstoppable
Domains, Inc.

**Reference/Docket
No.** 1T20731075

**Correspondence
Email Address:**

nyustmp@ladas.com

# NONFINAL OFFICE ACTION

The USPTO must receive applicant's response to this letter within  six months of the issue date below or the application will be **abandoned**.
Respond using the Trademark Electronic Application System (TEAS).  A link to the appropriate TEAS response form appears at the end of this
Office action.

**Issue date:  May 28, 2021**

**Introduction**

This Office action is in response to applicant's communication filed on May 5, 2021.   In the previous Office action, the Examining Attorney
issued/maintained the following refusals and requirements:

> Section 2(e)(1) Refusal - Merely Descriptive
> Sections 1, 2, 3, and 45 Refusal - Failure to Function as Service Mark
> Section 2(a) Refusal - Deceptive
> Requirement for Acceptable Identification of Services
> Requirement for Information

The applicant's response  **obviates** the Section 2(a) Refusal and **satisfies** the two requirements.  The applicant has responded to the two other
refusals by deleting all of the services in Class 42 and submitting argument and evidence.  However, for the reasons discussed below, both
refusals are **maintained and continued** as to the remaining services.

Additionally, upon further review, the Examining Attorney notes that an additional requirement should have been issued regarding the
applicant's domicile.   The Examining Attorney apologizes for the delay in issuing this requirement.  Accordingly, this is a non-Final Office
action.

**Summary of Issues Applicant Must Address**

- Sections 1, 2, 3, and 45 Refusal - Failure to Function as Service Mark
- Section 2(e)(1) Refusal - Merely Descriptive
- Requirement for Applicant's Domicile Address

## Sections 1, 2, 3, and 45 Refusal – Failure to Function as Service Mark

The applicant has applied for registration of. WALLET in standard character form for the following services (as amended by the applicant's response):

Alternative Root Blockchain Domain name registration services featuring the textual elements in the mark, in Class 45.

Registration was previously refused because the applied-for mark the applied-for mark consists of a top-level domain name (TLD) used in connection with domain registration services; it does not function as a service mark to identify and distinguish applicant's services from those of others and to indicate the source of applicant's services.   Trademark Act Sections 1, 2, 3, and 45, 15 U.S.C. §§1051-1053, 1127; *see In re Keep A Breast Found.*, 123 USPQ2d 1869, 1879-80 (TTAB 2017); *In re Moody's Investors Serv., Inc.* , 13 USPQ2d 2043, 2048-49 (TTAB 1989); TMEP §§1215.02(d), 1301.02 *et seq.*

Whether a designation functions as a mark depends on the commercial impression it makes on the relevant public; that is, whether purchasers would be likely to regard it as a source-indicator for the services.  *See In re Keep A Breast Found.*, 123 USPQ2d 1869, 1879 (TTAB 2017) (quoting *In re Eagle Crest Inc.*, 96 USPQ2d 1227, 1229 (TTAB 2010)); TMEP §1301.02.

Not every designation used in the advertising or performance of services functions as a service mark, even though it may have been adopted with the intent to do so.  *In re Keep A Breast Found.*, 123 USPQ2d at 1879 (quoting *Am. Velcro, Inc. v. Charles Mayer Studios, Inc.*, 177 USPQ 149, 154 (TTAB 1973)); *see* TMEP §1301.02.  A designation can only be registered when purchasers would be likely to regard it as a source-indicator for the services.  TMEP §1301.02; *see In re Moody's Investors Serv. Inc.* , 13 USPQ2d 2043, 2047-49 (TTAB 1989).

Further, the guidance in the TMEP regarding specific categories of designations that fail to function as trademarks/service marks does not and cannot encompass every possible situation, especially when the designation involves an evolving area of technology, as in this case.  *See Applicant's Response, 5/5/2021, TSDR, at 11, 79-80*  (discussing and illustrating the absence of references to alternative root domains and blockchain in the current version of the TMEP; *see also* TMEP §§1202, 1301.02(a), which provides non-exhaustive lists of examples of situations where a designation fails to function as a trademark or service mark.

One of the situations in which designations have been found to not function as service marks are those in which the designation was structured as a top-level domain name and the services involved some type of domain service.  TMEP §§1215.01-1215.02 discuss the original limited number of top-level domain names, the lack of source identifying significance of top-level domain names within the context of domain names, and how ICANN's 2011 expansion of top-level domain names led to additional case law regarding failure to function refusals for designations consisting solely of top-level domain names.  Thus, TMEP §1215.02(d) was added to address this new failure to function situation due to evolving technology and domain name policies.  Further, as ICANN's TLD expansion allowed for existing brands to submit applications for TLDs composed of their existing marks, the TMEP was further amended to include an exception to the failure to function refusal for situations in which an existing brand's trademark/service mark significance transfers to the new TLD.   This is the purpose of the limited exception in TMEP §§1215.02(d) *et seq*.  *Accord In re Vox Populi Registry Ltd.*, 2020 USPQ2d 11289 at *7 (TTAB, 2020) ("Although the USPTO is not bound by ICANN's criteria for its program to introduce new gTLDs, in view of ICANN including in its program new gTLDs based on existing brand names, the USPTO's guidance acknowledges that, 'in some circumstances, a gTLD may have source-indicating significance.'") (citing TMEP §1215.02(d)).

The applicant's current and previous responses include several pages discussing the definitions of registry operator and registrar in the TMEP, distinguishing how the applicant's domain registration process differs from the process (and terms) used by ICANN, and arguing that the applicant cannot comply with the TMEP exception because it cannot and should not have to sign a registry agreement with its competitor, ICANN.  *Applicant's Response, 9/30/2020, TSDR, at 12-13* ; *Applicant's Response 5/5/2021, TSDR, at 11-12.*

This argument was addressed in the previous Office action.  Specifically, applicant argues that it is not a registry operator or registrar as set forth in TMEP §1215.02(d).  *Applicant's Response, 9/30/2020, TSDR, at 12-13; Applicant's Response, 5/5/2021, TSDR, at 11-13*  .  TMEP §1215.02(d) discusses three roles relating to TLDs, the third being resellers (entities that are authorized by registrars to sell or register particular Internet addresses on a given top-level domain).  TMEP §1215.02(d); *accord Applicant's Response, 9/30/2020, TSDR, at 38* .  The section defines a registrar as "an entity through which domain names may be registered."   TMEP §1215.02(d).  The applicant's services are "Domain name registration services."   Thus, the applicant is "an entity through which domain names may be registered."   The section also states that a "registrar" is "responsible for keeping website contact information records and submitting the technical information to a central directory (i.e., the "registry")."  *Id.*  A registry is considered to be "the master database of all domain names registered in each top-level domain."  *Id.*  Thus, by updating the relevant blockchain as domain names are registered, *see Applicant's Response, 9/30/2020, TSDR, at 6-8* , the applicant does appear

to perform duties analogous to that of a registrar, with the blockchain serving as the master (albeit distributed) database. *See Applicant's Response, 9/30/2020, TSDR, at 7* (describing the blockchain as a distributed ledger).  However, even if this section is read narrowly as only applying to registry operators and registrars affiliated with ICANN delegated TLDs, and thus, as the applicant asserts, an entity must perform all of the listed functions of a registrar or registry operator for the section to apply, *Applicant's Response, 5/5/2021, TSDR, at 12-13* , there is nothing in the section that prevents, as in this case, issuance of a failure to function refusal for alternative root TLDs, if by analogy to ICANN-delegated TLDS, consumers would not perceive those TLDs as service marks, which is the case here for the designation .WALLET.

Thus, the issue for this refusal is not whether the service provided by the applicant exactly matches the "registry operator" and/or "registrar" definitions set forth in TMEP §1215.02(d), but whether the applicant's services are sufficiently analogous to those services such that purchasers of the applicant's services would be unlikely to regard .WALLET as a source-indicator for the applicant's services.   *See* TMEP §1301.02. Further, the requirement to have a registry agreement with ICANN set forth in TMEP §1215.02(d)(iii), and discussed at *Applicant's Response, 5/5/2021, TSDR, at 910-11*, is not relevant to this refusal because the applicant does not claim to own any prior registrations featuring the same mark, and thus does not meet the criteria in TMEP §1215.02(d)(i) for the TLD to have source identifying significance derived from a previously registered mark.  *See also* TMEP §§1212.04 *et seq*., which describes a similar/analogous use of prior registrations to support a Section 2(f) claim.

Here, applicant's mark, combines a leading period with the term WALLET, for domain name registration services. Purchasers would perceive the applied for mark as a TLD because it is structured in the manner of a top-level domain. That is, purchasers are accustomed to the combination of a period followed immediately by a term as a top-level domain. *See* Wikipedia®, *Top-Level Domain,* http://en.wikipedia.org/wiki/Top-level_domain (viewed on Jan-17-2019, 11:57 EST) ("A top-level domain ( TLD) is one of the domains at the highest level in the hierarchical Domain Name System of the Internet. . . . For example, in the domain name www.example.com, the top-level domain is .com."),  *Office action, 3/31/2020, TSDR, at 2-5.*

Top-level domains are "of the broadest category of names under which all domain names fit".  *See Microsoft Internet & Networking Dictionary definition of top-level domains, Office action, 3/31/2020, TSDR, at 10.* Purchasers are accustomed to top-level domains being used as parts of domain names used to access internet pages, and to direct email, and not for source identification. *See* attached articles from LexisNexis database, showing examples of consumer perception of top-level domains, *Office action, 3/31/2020, TSDR, at 11-24.*

Material obtained from computerized text-search databases, such as LexisNexis®, is generally accepted as competent evidence.  *See In re The Boulevard Entm't, Inc.* , 334 F.3d 1336, 1342-43, 67 USPQ2d 1475, 1479 (Fed. Cir. 2003); *In re Giger*, 78 USPQ2d 1405, 1407 (TTAB 2006); TBMP §1208.01; TMEP §710.01(a)-(b).

ICANN (Internet Corporation for Assigned Names and Numbers) is currently in the midst of an application process for an extensive expansion of TLDs. ICANN, *New Generic Top-Level Domains,* http://newgtlds.icann.org/en/about (viewed on Jan-28-2013, 17:13 EST) ("The New generic Top-level Domain Program was developed to increase competition and choice by introducing new gTLDs into the Internet's addressing system. . . .There are roughly two dozen gTLDs now, but soon, there could be hundreds."). ICANN, *About the New gTLD Program,* http://newgtlds.icann.org/en/about/program (viewed on Jan-28-2013, 17:13 EST), *Office action, 3/31/2020, TSDR, at 6-7.*

As a result, the previous Office actions included a conclusion that when .WALLET is used in connection with domain name registration services, consumers will perceive the term as merely referring to a domain name that can be acquired through applicant's services, and not as an indication of source for domain name registration services.

The applicant indicated in response to a previously issued information requirement that applicant intends to use .WALLET as a non-ICANN blockchain top-level domain, *Applicant's Response, 9/30/2020, TSDR, at 224,*  and has now amended the identification to limit the services to "Alternative Root Blockchain Domain name registration services featuring the textual elements in the mark,"  *i.e*., .WALLET.

In its previous response, the applicant argued that consumers would not perceive .WALLET as a TLD "because the applicant's services relate to blockchain domains, which are materially different from traditional domains . . . because blockchain domains . . . operate outside of the ICANN's domain system" as an alternative root. *Applicant's Response, 9/30/2020, TSDR, at 6* , 9. The applicant's current response essentially restates that argument, and argues that the previously attached Wikipedia and ICANN evidence are "inapplicable to the case at hand." *Applicant's Response, 5/5/2021, TSDR, at 7* .

The ICANN evidence regarding traditional top-level domain names and ICANN's expansion of top-level domains was provided for two reasons:  (1) the applicant's identification was previously broad enough to include registration of traditional top-level domain names, and (2) consumers' exposure to traditional domain names is relevant to how those consumers perceive alternative root top-level domains.  Thus, although the applicant has now amended its services to exclude traditional top-level domains, the evidence from ICANN's website discussed above regarding traditional top-level domains is still relevant to consumer perception.  As to the Wikipedia article, in addition to traditional domain names, it specifically discusses alternative root domains:

> ICANN's slow progress in creating new generic top-level domains, and the high application costs associated with TLDs, contributed to the creation of alternate DNS roots with different sets of top-level domains. Such domains may be accessed by

configuration of a computer with alternate or additional (forwarder) DNS servers or plugin modules for web browsers. Browser plugins detect alternate root domain requests and access an alternate domain name server for such requests.

Wikipedia®, *Top-Level Domain*, http://en.wikipedia.org/wiki/Top-level_domain (viewed on Jan-17-2019, 11:57 EST), *Office action, 3/31/2020, TSDR, at 4* . Thus, this article is also still relevant because it demonstrates that alternative root domains are top-level domains and would be perceived as such.

The applicant has argued that because blockchain domains resulting from the applicant's services can be used for a number of applications, consumers would view .WALLET as more than just a top-level domain name. *Applicant's Response, 5/5/2021, TSDR, at 5* . However, traditional domains also can be used for more applications than just a web address, *see, e.g.,* Verisign, Search Engine Land, *Three Ways to Use a Domain Name for Business Today*, https://searchengineland.com/three-ways-use-domain-name-business-today-286465 (viewed on May-26-2021, 07:28 EDT) (discussing the use of domain names for, inter alia, email and web forwarding), and, blockchain domains can be used similarly to traditional web addresses. *See* Unstoppable Domains, *My Websites*, https://unstoppabledomains.com/my-websites (viewed on May-25-2021, 17:49 EDT) (providing templates and instructions for setting up decentralized websites).

The applicant has also now attempted to distinguish the blockchain domains obtained through its services from traditional domains by claiming that blockchain domains are non-fungible assets. *See Applicant's Response, 5/5/2021, TSDR, at 4-5* ; *accord* Unstoppable Domains, *Feature Guide*, https://unstoppabledomains.com/features (viewed on May-5-2021) (showing mydomainnames.crypto available for sale for $40.00 in contrast to mydomainnames.zil for sale for $20.00), *Applicant's Response, 5/5/2021, TSDR, at 67* .

However, traditional domain names are also not one-price-fits-all (fungible) assets. Instead, traditional domain names significantly vary in value based on their perceived quality and demand. For example, the applicant is referred to the attached excerpt from Enaming, *Recent Domain Sales*, https://enaming.com/recent-sales (viewed on May-25-2021, 13:47 EDT), which provides examples of traditional domain names that have sold for over $100,000, including exclusive.com, which recently sold for $350,000, and engage.com, which sold for $803,025, and Namecheap, *XYZ*, https://www.namecheap.com/domains/registration/results/?domain=xyz (viewed on May-25-2021, 13:50 EDT), which indicates that the domain name xyz.website can be purchased for just $325.00. Traditional domain names are even pledged as collateral. *See, e.g.*, McGuireWoods, *Enforcing a Security Interest in Domain Names*, https://www.mcguirewoods.com/client-resources/Alerts/2018/2/Enforcing-a-Security-Interest-in-Domain-Names (viewed on May-25-2021, 14:07 EDT).

Thus, the fact that domain names resulting from the applicant's domain name registration service are non-fungible assets does not impact whether the mark would be perceived as a TLD for the domains registered by that service.

The applicant's arguments in both responses discuss differences between the registration of traditional and blockchain domains. *Applicant's Response, 9/30/2020, TSDR, at 6-8; Applicant's Response 5/5/2021, TSDR, at 11-12* . In the applicant's initial response, the applicant noted custodial/ownership differences between traditional and blockchain domains. *Applicant's Response, 9/30/2020, TSDR, at 6-7* .

The applicant then presented the following argument:

> [T]he Applicant as the "creator" is and would forever be the sole source of the . . . .WALLET branded blockchain domain on a specific blockchain. Even upon a transfer to the consumer or subsequent third parties, the nature of which is necessarily whole and irrevocable, the blockchain domain would forever be branded with the Applicant's mark, and the consumers would necessarily understand the original source of the services.

*Applicant's Response, 9/30/2020, TSDR, at 8* . However, this "sole source" role is analogous to traditional registry operator services. *See* TMEP §1215.02(d) ("A 'registry operator' maintains the master database of all domain names registered in each top-level domain."). The TTAB recently considered a similar argument regarding the use of a TLD as a source identifier for registry operator services and found that due to the incorporation of the TLD into the resulting domains, consumers would not view the TLD as a source identifier for the registry operator services. *In re Vox Populi Registry Ltd*., 2020 USPQ2d 11289 (TTAB, 2020). Specifically, the Board stated:

> [C]onsumers are "highly conditioned" to view a gTLD as signifying its function as a portion of an Internet domain name, and due to this consumer predisposition and the fact that "gTLDs are intended to be used by multiple, often numerous, parties as part of their own domain names," a gTLD proposed for registration as a mark for services involving registration of domain names in the specified gTLD typically will not be perceived as a source indicator.

*Id.* at *10 (citing *In re AC Webconnecting Holding B.V*., 2020 USPQ2d 11048, at *3 (TTAB 2020). The Applicant's response does not specifically discuss this case, which was decided on October 29, 2020, just days before the last Office action was issued, but instead asserts without support that "the notion that 'consumers are accustomed to perceiving the mere inclusion of a leading dot followed by a term to immediately indicate or solely convey a top-level domain' has since departed." *Applicant's Response, 5/5/2021, TSDR, at 15* . The applicant goes on to claim that due to the growing interest in NFTs, "[c]onsumers familiar with blockchain domains do perceive the branding component of the blockchain domain . . . to be . . . source identifying." *Applicant's Response, 5/5/2021, TSDR, at 15* . However, as discussed above,

traditional domains are also non-fungible assets. Thus, although there are some technological differences in how traditional and alternative root domains are used, they are structured in the same way and thus would be perceived as top-level domains by consumers.

Further, this "sole source" role is contradicted by the applicant's acknowledgement elsewhere in both responses that due to the nature of alternative root name server systems, "there can exist more than one domain with an identical name," because "there can exist blockchain domains that are identical in appearance, but originating from different and unrelated sources." *Applicant's Response, 9/30/2020, TSDR, at 17; Applicant's Response, 5/5/2021, TSDR, at 16.* "[A]s blockchain domains are alternative roots which can exist in separate systems, any number of third parties such as Company C to Company Z, could each create and distribute into the market identical .WALLET-branded blockchain domains." *Applicant's Response, 9/30/2020, TSDR, at 18; Applicant's Response, 5/5/2021, TSDR, at 14* (acknowledging that consumers cannot distinguish blockchain domains featuring the same TLD from different sources because such domains are identical in appearance). The applicant now argues that these potential third-party .WALLET-branded blockchain domains would not be authentic because they would only be "superficially" branded with a source indicator. *Applicant's Response, 5/5/2021, TSDR, at 16.* However, as described by the applicant previously, each of these alternative domains would have their own blockchain and would be authentic and verifiable from the perspective of that blockchain. Notably, the messages provided by the applicant as evidence use the terms UNSTOPPABLE DOMAINS and HANDSHAKE/HNS as the source identifiers for the competing .crypto blockchain domains, with .crypto used merely to identify the referenced TLD. *See Applicant's Response, 5/5/2021, TSDR, at 55.*

The applicant has also now provided evidence, which it asserts shows that consumers associate the .CRYPTO TLD as a source identifier for the applicant's services. *Applicant's Response, 9/30/2020, TSDR, at 14.* That evidence is not applicable to the perception of .WALLET in this case, and would only be relevant in the applicant's copending application No. 88276683 for .CRYPTO regarding whether the mark is capable of or has acquired distinctiveness. Further, the applicant's allegations regarding any alleged infringement and consumer confusion relating to the .CRYPTO TLD, *Applicant's Response, 5/5/2021, TSDR, at 14-15* , are not applicable to the TLD in this application.

However, the applicant's evidence provided in support of that argument includes printouts the website where the .crypto auction was held. *Applicant's Response, 5/5/2021, TSDR, at 56-65* . Attached are additional printouts from that and associated websites, which confirm that the .crypto TLD, as well as the .wallet TLD in this application, and another TLD (.zil) for which the applicant has submitted trademark applications were all sold/auctioned on those sites.

The applicant previously described the differences between blockchain domain registration services and traditional domain registration services and specifically discussed how traditional domain names can be cancelled or transferred, such as pursuant to a UDRP complaint, but that "no third party (including even the Applicant) can move or seize [a] blockchain domain." *Applicant's Response, 9/30/2020, TSDR, at 6-7* . Thus, for similar reasons, the applicant appears to lack the authority to direct Handshake to cancel the sales of the .crypto, .zil, and .wallet TLDs on its blockchain and/or to cancel/transfer any resulting domain name registrations on its block chain featuring those TLDs, and even though the applicant successfully had a listing for an alleged "'fake' .CRYPTO-branded blockchain domain . . . taken down and removed by the administrators of the marketplace," *Applicant's Response, 5/5/2021, TSDR, at 7* , the applicant has not stated that domain was cancelled or transferred to the applicant and thus presumably that domain continues to exist on a competing blockchain.

As noted in the previous Office action, the applicant's use of .WALLET as a non-ICANN blockchain top-level domain would also not necessarily stop another entity from applying to register this string with ICANN. *See, e.g.,* ICANNWiki, *Alternative Roots*, https://icannwiki.org/Alternative_Roots (viewed on Sep-29-2020) ("The .biz TLD created by Pacific Root was in operation before ICANN proposed running .biz, and at least one of the alternative root servers resolves .biz to Pacific Root's. There are .biz domain names that exist in different roots and point to different IP addresses. The possibility of such conflicts, and their potential for destabilizing the Internet, is the main source of controversy surrounding alt roots."), *Applicant's Response, 9/30/2020, TSDR, at 171.*

Further, if the domain names themselves are perceived as having value apart from their functions, similar to the digital art work (and other digital items) currently sold as Non-Fungible Tokens, and referenced in the Applicant's response, *Applicant's Response, 5/5/2021, TSDR, at 4-5* , *25-35, 87-88,* this will result in multiple entities (in addition to opensea.io discussed *infra*) other than the applicant offering domain names featuring the WALLET TLD for resale/transfer similar to the traditional domain names listed on the Namecheap site discussed above.

As explained by the applicant, "while the Applicant initially registers the blockchain domain for the customer by transferring the blockchain domain to the customer's digital wallet, the Applicant does not retain any control of the blockchain domain once the transfer is complete." *Applicant's Response, 5/5/2021, TSDR, at 12* . Specifically, "the holder of the blockchain domain has complete control and acts as it so chooses." *Applicant's Response, 5/5/2021, TSDR, at 12* . Although, the Applicant's response references a "fake .crypto domain listing" on opensea.io, *see Applicant's Response, 5/5/2021, TSDR, at 51-52,* this site already offers .crypto domains for sale by a number of sources, including Gerold53 and 841873. Although the applicant's Unstoppable Domains mark and U logo appear in conjunction with these listings to presumably confirm/verify that these sites are on the applicant's blockchain, the applicant is not the source of these sales. In other words, potential purchasers of these .crypto domain names would view Gerold53 and 841873, respectively, as the sources of these particular domain names. The applicant's response confirms that when domain names like these are sold, the process of transferring them from the current owner, *e.g*, Gerold53, to the new owner involves the current owner selecting the particular domain from his/her wallet, selecting the third-party destination digital wallet address, and confirming the transfer. *Applicant's Response, 5/5/2021, TSDR, at 112* . Further, the attached evidence

from opensea.io indicates that listings for other domain name NFTs, including those featuring the .ETH TLD are validated by different entities (Ethereum Name Service (ENS) and Decentraland Names), and thus are additional evidence that consumers would not associate the applicant's alternative root domain with a single source.

Thus, for the foregoing reasons, .WALLET does not function as a service mark to identify and distinguish applicant's services from those of others and to indicate the source of applicant's services.  Accordingly, the refusal to register the mark under Trademark Act Sections 1, 2, 3, and 45 is **maintained and continued**.

Although applicant's mark has been refused registration, applicant may respond to the refusal by submitting evidence and arguments in support of registration in a formal response using the link at the bottom of this Office action.  **Please note that informal communications (phone and email) may not be used to request advisory opinions as to the likelihood of overcoming a substantive refusal**. TMEP §709.05.  To properly introduce Internet evidence into the record, an applicant must provide (1) an image file or printout of the downloaded webpage, (2) the date the evidence was downloaded or accessed, and (3) the complete URL address of the webpage.  *See In re I-Coat Co., LLC*, 126 USPQ2d 1730, 1733 (TTAB 2018); TBMP §1208.03; TMEP §710.01(b).

Applicant should note the following additional ground for refusal.

## Section 2(e)(1) Refusal – Merely Descriptive

The applicant has applied for registration of .WALLET in standard character form for the following services (as amended by the applicant's response):

> Alternative Root Blockchain Domain name registration services featuring the textual elements in the mark, in Class 45.

Registration was previously refused because the applied-for mark merely describes characteristics of applicant's services.   Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq.*

A mark is merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose, or use of an applicant's goods and/or services.  TMEP §1209.01(b); *see, e.g.*, *In re TriVita, Inc.*, 783 F.3d 872, 874, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015) (quoting *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004)); *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005) (citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents* , 252 U.S. 538, 543 (1920)).

"Whether consumers could guess what the product [or service] is from consideration of the mark alone is not the test."  *In re Am. Greetings Corp.*, 226 USPQ 365, 366 (TTAB 1985).  The question is **not** whether someone presented only with the mark could guess what the goods and/or services are, but **"whether someone who knows what the goods and[/or] services are will understand the mark to convey information about them."**  *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1254, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012) (quoting *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002)); *In re Mueller Sports. Med., Inc.*, 126 USPQ2d 1584, 1587 (TTAB 2018).

The applicant has argued that a Section 2(e)(1) Refusal must be based on "substantial evidence."  *Applicant's Response, 5/5/2021, TSDR, at 4* (citing *In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828 (Fed. Cir. 2007).  However, the "substantial evidence" reference was in the context of the court's standard for reviewing the TTAB's findings of fact, and was defined by the court as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bayer*, 488 F.3d at 963, 82 USPQ2d at 1831 (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  The evidence of record in this case meets that standard.

When a mark consists of wording combined with punctuation, the issues for descriptiveness are usually (1) whether the wording merely describes the applicant's services, and (2) whether the addition of the punctuation changes the connotation of the wording such that the mark as a whole is not merely descriptive.  *See In re Mecca Grade Growers, LLC*, 125 USPQ2d 1950, 1955 (TTAB 2018); TMEP §1209.03(u); *see DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1253-54, 103 USPQ2d 1753, 1757-58 (Fed. Cir. 2012).

As discussed in the above refusal, when a mark consists of wording preceded by a period or dot for services involving domain registration or domain registry operator services, the mark as a whole would be perceived as a top-level domain.  The applicant's arguments regarding whether consumers would perceive .WALLET as TLD because it is used for alternative domain name registration services rather than traditional domain name registration services have been discussed in detail in the above refusal.

Top-level domains or **TLDs** often describe the subject matter or user of the domain space. *In re theDot Communs. Network LLC*, 101 USPQ2d 1062, 1067 (TTAB 2011). When the applied-for top-level domain engenders the commercial impression of a top-level domain, consumers would anticipate that the top-level domain identifies the registration of domains in the field identified in the mark. *Id.*  In other words, if the wording in the applicant's mark merely describes the applicant's services, adding the period/dot to convert the mark into a TLD does not overcome that descriptive significance.

Here, the applicant's mark combines a leading period with the term "WALLET" for domain name registration services.   In the initial Office action, the Examining Attorney found that in this context, "wallet" would be viewed as a reference to an electronic or digital wallet, *i.e.*, "Software that resides on a buyer's computer and holds digital cash, and a digital certificate with a digital signature, as well as billing, shipping, and payment information for online transactions."   Business Dictionary, *Digital Wallet*, http://www.businessdictionary.com/definition/digital-wallet.html, *Office action, 3/31/2020, TSDR, at 25*.   As the applicant has acknowledged, the applicant has now deleted all of the software from the application.  *Applicant's Response, 5/5/2021, TSDR, at 5*.

The applicant has also asserted that because the applicant's services are blockchain based, there is no digital cash stored on the blockchain or within the applicant's software.  *Applicant's Response, 9/30/2020, TSDR, at 3* .  Instead, the applicant previously provided the following definition of cryptocurrency wallets, which are intended for use with blockchain:

> Cryptocurrency wallets are software programs that store your private and public keys and interface with various blockchains so users can monitor their balance, send money and conduct other operations.

Ameer Rosic, BlockGeeks, *Cryptocurrency Wallet Guide: A Step-By-Step Tutorial*, https://blockgeeks.com/guides/cryptocurrency-wallet-guide/. (viewed on Sep-29-2020), *Applicant's Response, 9/30/2020, TSDR, at 63*.

This article uses "digital wallet" interchangeably with "cryptocurrency wallet" and emphasizes that "digital wallets don't store currency." *Applicant's Response, 9/30/2020, TSDR, at 62-63*.   The article indicates that these wallets that store the private and public keys can exist in a variety of forms:  software (including desktop, online, and mobile), hardware, and paper.  *Applicant's Response, 9/30/2020, TSDR, at 63-64*. Thus, they demonstrate that cryptocurrency wallets do include "payment information for online transactions" in the form of private and public keys.

In addition to providing the above definition, this website describes the following process for using a blockchain wallet:

> When a person sends you bitcoins or any other type of digital currency, they are essentially signing off ownership of the coins to your wallet's address. To be able to spend those coins and unlock the funds, the private key stored in your wallet must match the public address the currency is assigned to. If the public and private keys match, the balance in your digital wallet will increase, and the sender['] will decrease accordingly. There is no actual exchange of real coins. The transaction is signified merely by a transaction record on the blockchain and a change in balance in your cryptocurrency wallet.

*Applicant's Response, 9/30/2020, TSDR, at 63*.

The domain names featured by the applicant's services are intended to facilitate cryptocurrency payments by serving as a shortcut to the keys stored in cryptocurrency wallets, and because these are alternative root domain names, require the use of software to facilitate the connection between the domain name and a wallet.  *See* Unstoppable Domains, *How to Connect Trust Wallet to Your Unstoppable Domains Account*, https://community.unstoppabledomains.com/t/how-to-connect-trust-wallet-to-your-unstoppable-domains-account/340 (viewed on Sep-29-2020) (providing step-by-step instructions to connect a .crypto domain to a wallet created with the Trust Wallet (Android) app), *Applicant's Response, 9/30/2020, TSDR, at 100-02*.  (The mark TRUST WALLET referenced on the applicant's website has been applied-for, but not yet registered; however, the term WALLET in that mark has been disclaimed, *Office action, 11/5/2020, TSDR, at 2-4*).

Once, the domain is connected to a wallet, a domain name registered with the applicant may then be provided in lieu of a key to facilitate payment directly to the domain owner's wallet.  Unstoppable Domains, *Blockchain Domains Starter Guide - What are Blockchain Domains?*, https://community.unstoppabledomains.com/t/blockchain-domains-starter-guide-what-are-blockchain-domains/109 (viewed on Sep-29-2020), *Applicant's Response, 9/30/2020, TSDR, at 19, 226; accord Applicant's Response, 9/30/2020, TSDR, at 7*   ("A cryptocurrency wallet is essentially a software program that stores private and public keys (i.e., credentials) and interacts with a blockchain to enable users to *inter alia* send and receive digital assets.).

Thus, for the foregoing reasons, consumers would perceive the applicant's mark as describing a use of the applicant's services.

"A mark may be merely descriptive even if it does not describe the 'full scope and extent' of the applicant's goods or services."     *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004) (citing *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001)); TMEP §1209.01(b).  It is enough if a mark describes only one significant function, attribute, or property.  *In re The Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); TMEP §1209.01(b); *see In re Oppedahl & Larson LLP*, 373 F.3d at 1173, 71 USPQ2d at 1371.

The applicant previously argued that the mark is not merely descriptive of the applicant's services because the relevant consumers "would need to utilize their own digital wallet in order to utilize their blockchain domain," because once acquired, the blockchain domain must be stored "in the consumer's own digital wallet," and "there would be no circumstance in which the relevant consumers would utilize [the Applicant's bespoke] software" services prior to this storage.  *Applicant's Response, 9/30/2020, TSDR, at 4, 7*.  However, this merely describes an additional

characteristic of the applicant's services.

The fact that the mark merely describes two characteristics of the applicant's services does not create a registrable double entendre. A "double entendre" is an expression that has a double connotation or significance as applied to the goods and/or services. TMEP §1213.05(c); *see In re Colonial Stores Inc.*, 394 F.2d 549, 552-53, 157 USPQ 382, 384-85 (C.C.P.A. 1968) (finding SUGAR & SPICE a double entendre and not descriptive for bakery products because it evokes the nursery rhyme "sugar and spice and everything nice"). However, a mark that comprises a "double entendre" is only registrable if one of its meanings is not merely descriptive in relation to the goods and/or services, which is not the case here. TMEP §1213.05(c).

The applicant now argues that the mark is not merely descriptive of the applicant's services because blockchain domains are all NFTs and all NFTs can be stored in digital wallets. *Applicant's Response, 5/5/2021, TSDR, at 5* . However, unlike the applicant's domains, not all NFTs function as keys to facilitate payments to and from digital/cryptocurrency wallets, as discussed above.

The applicant's argument now highlights how "incongruous" its previous comparison of an alternative root top-level domain name is to electrical equipment like power strips. *See Applicant's Response, 5/5/2021, at 6* . The fact that a typical power strip is not a drill, and would not be described as one, has no impact on whether the term WALLET merely describes a characteristic of the applicant's services, which have nothing to do with power strips or drills, in this case. Similarly, the applicant's analogy to a box for a painting is a flawed analogy, because the applicant's . WALLET domains are not merely stored in digital/cryptocurrency wallets, *see Applicant's Response, 5/5/2021, at 4,* but also facilitate payments to and from such wallets.

In *In re theDot Communs. Network LLC*, 101 USPQ2d 1062, 1067-68 (TTAB 2011), the Board concluded that "applicant's proposed mark .music conveys the commercial impression of a top-level domain name similar to .com, .net, etc., and not merely the word 'Music' featuring nondistinctive punctuation. Moreover, consumers would understand it to be a top-level domain in the field of music. . . . [Further,] [b]ecause .music engenders the commercial impression of a top-level domain name and top-level domain name owners register domain names, consumers would anticipate that .music identifies the registration of domain names for a music-related top-level domain. Accordingly, [the Board found] that the term .music is merely descriptive for the 'registration of domain names for identification of users on a global computer network.'"

Similarly, .WALLET in this case is merely descriptive of the applicant's domain registration services, which, *inter alia*, are intended to facilitate payments between digital/cryptocurrency wallets. As with the finding that .music was merely descriptive of uses of the domain names after registration, the fact that payments between wallets do not occur until after the registration process does not overcome this refusal.

The applicant has also now provided evidence, which it asserts shows that consumers associate the .CRYPTO TLD as a source identifier for the applicant's services. *Applicant's Response, 9/30/2020, TSDR, at 7.* That evidence is not applicable to the perception of .WALLET in this case, and would only be relevant in the applicant's copending application No. 88276683 for .CRYPTO regarding whether the mark is capable of or has acquired distinctiveness. Further, as discussed above, the messages provided by the applicant as evidence for this assertion use the terms UNSTOPPABLE DOMAINS and HANDSHAKE/HNS as the source identifiers for the competing .crypto blockchain domains, with .crypto used merely to identify the referenced TLD. *See Applicant's Response, 5/5/2021, TSDR, at 5; accord Applicant's Response, 5/5/2021, TSDR, at 7* (acknowledging that consumers cannot distinguish blockchain domains featuring the same TLD from different sources because such domains are identical in appearance).

Much of the applicant's argument regarding this refusal is addressed to whether consumers would perceive .WALLET as a top-level domain for alternative root domains, *see, e.g., Applicant's Response, 5/5/2020, TSDR, at 5-7* , and that argument is addressed in detail in the above refusal. However, assuming, *arguendo*, that consumers would not view .WALLET as top-level domain, the mark is still merely descriptive of the applicant's services.

In that case, WALLET is still merely descriptive of a characteristic of the applicant's services for the reasons discussed above, namely, because the domains facilitate payments to and from cryptocurrency/digital wallets. Adding punctuation marks to a descriptive term will not ordinarily change the term into a non-descriptive one. *In re Mecca Grade Growers, LLC*, 125 USPQ2d 1950, 1955 (TTAB 2018); TMEP §1209.03(u); *see DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1253-54, 103 USPQ2d 1753, 1757-58 (Fed. Cir. 2012). Similarly, in this case, the addition of the dot or period to the descriptive term WALLET does not change the descriptive meaning of the mark.

Applicant argues that any doubt regarding the mark's descriptiveness should be resolved on applicant's behalf. *Applicant's Response, 9/30/2020, TSDR, at 3; Applicant's Response, 5/5/2021, TSDR, at 3; e.g., In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567, 1571 4 USPQ2d 1141, 1144 (Fed. Cir. 1987); *In re Grand Forest Holdings, Inc.*, 78 USPQ2d 1152, 1156 (TTAB 2006). However, in the present case, the evidence of record leaves no doubt that the mark is merely descriptive.

Accordingly, the proposed mark is merely descriptive, and the refusal to register the mark on the Principal Register under Section 2(e)(1) is **maintained and continued**.

Although applicant's mark has been refused registration, applicant may respond to the refusal by submitting evidence and arguments in support

of registration in a formal response using the link at the bottom of this Office action. **Please note that informal communications (phone and email) may not be used to request advisory opinions as to the likelihood of overcoming a substantive refusal**. TMEP §709.05. To properly introduce Internet evidence into the record, an applicant must provide (1) an image file or printout of the downloaded webpage, (2) the date the evidence was downloaded or accessed, and (3) the complete URL address of the webpage. *See In re I-Coat Co., LLC*, 126 USPQ2d 1730, 1733 (TTAB 2018); TBMP §1208.03; TMEP §710.01(b).

If applicant responds to the refusals, applicant must also respond to the requirement set forth below.

## Requirement for Applicant's Domicile Address

**Applicant must provide applicant's domicile address.** All applications must include the applicant's domicile address, which is required for a complete application. *See* 37 C.F.R. §§2.22(a)(1), 2.32(a)(2), 2.189.

A juristic entity's domicile is the principal place of business, i.e., headquarters, where a juristic entity applicant's senior executives or officers ordinarily direct and control the entity's activities. 37 C.F.R. §2.2(o); Examination Guide 4-19, at I.A. An applicant whose domicile is located outside of the United States or its territories is foreign-domiciled and must be represented at the USPTO by a U.S.-licensed attorney qualified to practice before the USPTO under 37 C.F.R. §11.14. 37 C.F.R. §2.11(a).

The application record lists applicant as a juristic entity and specifies applicant's domicile as private mailbox/mailbox forwarding service instead of a street address. See the attached evidence. In most cases, a private mailbox and/or mail forwarding service is not acceptable as a domicile address because it does not identify the location of applicant's headquarters where the entity's senior executives or officers ordinarily direct and control the entity's activities. *See* 37 C.F.R. §§2.2(o)-(p), 2.189; Examination Guide 4-19, at I.A.3. Thus, applicant must provide its domicile street address. *See* 37 C.F.R. §2.189. Alternatively, an applicant may demonstrate that the listed address is, in fact, the applicant's domicile. Examination Guide 4-19, at I.A.3.

**To provide documentation supporting applicant's domicile.** Open the correct TEAS response form and enter the serial number, answer "yes" to wizard question #3, and on the "Additional Statement(s)" page, below the "Miscellaneous Statement" field, click the button below the text box to attach documentation to support the address.

**To provide applicant's domicile street address.** After opening the correct TEAS response form and entering the serial number, answer "yes" to wizard question #5, and provide applicant's street address on the "Owner Information" page. Information provided in the TEAS response form will be publicly viewable.

*If applicant wants to hide its domicile address from public view* because of privacy or other concerns, applicant must have a mailing address that can be made public and differs from its domicile address. In this case, applicant must follow the steps below in the correct order to ensure the domicile address will be hidden:

(1) First submit a TEAS Change Address or Representation (CAR) form. Open the form, enter the serial number, click "Continue," and
    (a) Use the radio buttons to select "Attorney" for the role of the person submitting the form;
    (b) Answer "Yes" to the wizard question asking, "Do you want to UPDATE the mailing address, email address, phone or fax number(s) for the trademark owner/holder?" and click "Continue;"
    (c) On the "Owner Information" page, if the previously provided mailing address has changed, applicant must enter its new mailing address in the "Mailing Address" field, which will be publicly viewable;
    (d) On the "Owner Information" page, uncheck the box next to "Domicile Address" and enter the new domicile address in the text box immediately below the checkbox.
(2) Then submit a TEAS response form to indicate the domicile address has been changed. Open the form and
    (a) Answer "yes" to wizard question #3 and click "Continue;"
    (b) Click on the "Miscellaneous Statement" box on the "Additional Statement(s)" page, and enter a statement in the text box immediately below the checkbox that the domicile address was previously changed in the CAR form.

**How to respond. Click to file a response to this nonfinal Office action.**

/Kim Teresa Moninghoff/
Examining Attorney
Law Office 113

Phone:  571-272-4738
Email:  kim.moninghoff@uspto.gov

**RESPONSE GUIDANCE**

- **Missing the response deadline to this letter will cause the application to** <u>abandon</u>.  A response or notice of appeal must be received by the USPTO before midnight **Eastern Time** of the last day of the response period.  TEAS and ESTTA maintenance or <u>unforeseen circumstances</u> could affect an applicant's ability to timely respond.

- <u>**Responses signed by an unauthorized party**</u> are not accepted and can **cause the application to** <u>abandon</u>.  Because applicant has an attorney, the response must be signed by the attorney.

- If needed, **find** <u>**contact information for the supervisor**</u> of the office or unit listed in the signature block.

**Search Engine Land**   SEO   SEM   LOCAL   RETAIL   GOOGLE   BING   SOCIAL   RESOURCES   LIVE   MORE   EVENTS          SUBSCRIBE

Retail

*Opinions expressed in this article are those of the sponsor.*

# Three ways to use a domain name for business today

Registering a domain name is one of the first steps to starting a new business. That's because whatever name is chosen will represent the business's space on the internet — and, possibly, a customer's first impression of the company. But once you have that domain name, what do you do? Don't stress over building an […]

Sponsored Content: Verisign on November 13, 2017 at 7:30 am



## ATTEND OUR EVENTS

Learn actionable search marketing tactics that can help you drive more traffic, leads, and revenue.

June 15-16, 2021: SMX Advanced
June 21-22, 2021: SMX Advanced Europe
August 17, 2021: SMX Convert
November 9-10, 2021: SMX Next
December 14, 2021: SMX Code
On-Demand: SMX
On-Demand: SMX Report
On-Demand: SMX Create

LEARN MORE ABOUT OUR SMX EVENTS

Discover actionable tactics that can help you overcome crucial marketing challenges.

September 14-15, 2021: MarTech
On-Demand: MarTech (spring 2021)
On-Demand: MarTech (fall 2020)

LEARN MORE ABOUT OUR MARTECH EVENTS

www.Com

Registering a domain name is one of the first steps to starting a new business. That's because whatever name is chosen will represent the business's space on the internet — and, possibly, a customer's first impression of the company.

But once you have that domain name, what do you do? Don't stress over building an online space. Start using a domain name right away. Here are three ways to do it.

## Set up a company-branded email address

The web address can also be used as an email address. A company-branded email address can give you and your employees a more professional-looking branded channel for communication with customers, as well as free marketing for your company. In a 2015 survey, 74 percent of consumers said they would trust a company-branded email address more than a free email address. It's easy and cost-effective to set up, too. The provider you use to register your domain name can most likely help you set up your email address quickly and inexpensively.

## Start a website

A website is one of the best tools to grow your business. These days, it's even easier to create than most people might think. While a social media presence can be a great asset, it may not provide the same level of marketing opportunities or credibility that a website does. In fact, in a 2015 survey, 77 percent of consumers believed a website made a business appear more credible.

You can start with a simple one-page website and scale it as you grow. Easy do-it-yourself tools allow business owners to create their own, and most service providers offer bundled services with everything you may need to build and maintain your website (e.g., domain name, web hosting, design templates).

Many businesses that offer professional services find that generally, all they need is a one- to four-

7:28:56 AM 5/26/2021

**Search Engine Land**   SEO   SEM   LOCAL   RETAIL   GOOGLE   BING   SOCIAL   RESOURCES   LIVE   MORE   EVENTS

SUBSCRIBE

templates).

Many businesses that offer professional services find that generally, all they need is a one- to four-page website that includes general information, contact information, product/service information, social media icons and links and customer testimonies.

If you plan to open an online store, or your business requires showing videos or other multimedia, then a more robust website may be needed. For example, you can add e-commerce capabilities to your website so you can take orders, process payments and provide customer support. Do-it-yourself website builders, like Weebly or Wix, also have packages that you can add on at any time, or a web developer can integrate the functionality for you.

Even if you don't plan to sell products online through standard e-commerce functionality, enabling lead capturing and processing, such as an email subscription list, on your website or social page to collect prospect information for further sales follow-up may still be a good idea.

## Brand your social media presence

If your main business page is currently on a social media site like Facebook, Etsy or Houzz, chances are the web address provided to you is branded to the specific platform and not for your business. These URLs are usually long and not very memorable, making it hard to market your page to customers. You can change that by using your domain name as the web address for your social media business page. This is called web forwarding, or redirecting. It gives you an easy-to-remember online address to help build your brand and use in your marketing efforts.

To start web forwarding, log in to your account (where you registered your domain name) and change the settings on your domain name. Oftentimes, the provider you registered your domain name with can also help you forward it.

## Promote your domain name

You can start building your brand with your domain name right away. Add it to social media platforms

**Search Engine Land**    SEO   SEM   LOCAL   RETAIL   GOOGLE   BING   SOCIAL   RESOURCES   LIVE   MORE   EVENTS          SUBSCRIBE   f   🐦   🔍



# Promote your domain name

You can start building your brand with your domain name right away. Add it to social media platforms that your customers frequent and online directories where your business is listed. That way, no matter where your customers find you online, you can always drive them back to your main online presence.

Likewise, include your web address on your business cards, ads, email signatures, uniforms, brochures, newsletters and other collateral you give to customers. This is a great way to promote your brand offline and gives potential customers an easy way to learn more about, and connect with, your business online. A 2015 study showed that 64 percent of consumers preferred to buy from businesses they can contact online.

In today's internet-centric world, many use the web to look for and research products or services. So the name your customers associate with your business is an important step to not only build your brand online, but possibly establish credibility.



7:29:59 AM 5/26/2021





UNSTOPPABLE DOMAINS          Docs    Developer Community          Search Domains          🛒    🔒 SIGN UP / SIGN IN

# My Websites

Ethereum gas prices are currently high and .crypto transactions could take up to 72 hours to process. If you need to process manage transactions faster, you can set your own gas price in the **Guest Manage** section.

**Launch**    My Websites

## Launch your website today

Use one of our templates to become a part of Decentralized Internet

⊕ Launch Website



🦁 You can now browse .crypto websites on Brave browser via desktop and Android! **Learn more!**    ✕

5:49:04 PM 5/25/2021          https://unstoppabledomains.com/my-websites









✉ Email Us   📞 +1.844.362.6464

Home   Acquisitions   Domains ⌄   Sell Domains   Buyer's Requests   Recent Sales   Contact   More ⌄

## RECENT DOMAIN NAME SALES

eNaming.com assists buyers & sellers of premium domain names acquire or divest their naming assets. Below you will find a sample of recently sold domain names priced at 100,000 USD and up in the global domain name marketplace.

If you believe you have quality domain name inventory to sell, or wish to buy premium domain names, please contact us to discuss.

| Date | Domain Name | Price |
|------|-------------|-------|
| 03/31/2021 | POKER.NET | 750,000 USD |
| 03/31/2021 | RECURSION.COM | 904,000 USD |
| 03/31/2021 | EXCLUSIVE.COM | 350,000 USD |
| 03/31/2021 | BODO.COM | 200,000 USD |

1:47:03 PM 5/25/2021                                        https://enaming.com/recent-sales

| 03/31/2021 | BODO.COM | 200,000 USD |
|---|---|---|
| 03/31/2021 | LET.COM | 200,000 USD |
| 03/31/2021 | HTTPS.COM | 197,000 USD |
| 03/31/2021 | LISTING.COM | 180,000 USD |
| 03/17/2021 | JOD.COM | 100,000 USD |
| 03/17/2021 | 509.COM | 106,000 USD |
| 03/17/2021 | REVER.COM | 107,222 USD |
| 03/17/2021 | PORN.CO | 120,000 USD |
| 03/17/2021 | COPE.COM | 138,000 USD |
| 03/17/2021 | SKATES.COM | 150,000 USD |
| 03/17/2021 | CLUSTER.COM | 150,000 USD |

1:47:37 PM 5/25/2021

| 12/23/2020 | ENGAGE.COM | 803,025 USD |
| 12/23/2020 | SPECTACLE.COM | 100,000 USD |
| 12/23/2020 | JHX.COM | 100,000 USD |
| 12/09/2020 | MIM.COM | 133,100 USD |
| 11/25/2020 | IAGENT.COM | 102,000 USD |
| 11/25/2020 | WALLPAPERS.COM | 129,500 USD |
| 11/25/2020 | ZCG.COM | 140,000 USD |
| 11/25/2020 | FANBASE.COM | 151,000 USD |
| 11/11/2020 | HOMEFINANCE.COM | 100,890 USD |
| 11/11/2020 | FOREVERYOUNG.COM | 150,000 USD |
| 11/11/2020 | BATH.COM | 195,000 USD |
| 11/11/2020 | PICTURE.COM | 225,000 USD |

1:48:08 PM 5/25/2021





McGUIREWOODS

MENU

# Enforcing a Security Interest in Domain Names

February 7, 2018

For many businesses, a domain name is among its most valuable assets. Lenders routinely seek to use domain names as collateral. However, perfecting a security interest in a domain name is only the first step because conflicting laws and the realities of technology create hurdles to foreclosing on this collateral after a default.

**Perfecting a Security Interest**

Practitioners and scholars disagree on the legal nature of a domain name. Some argue that a domain name represents only a conditional contractual right for the term of registration. Others compare a domain name to an intangible property, like a telephone number. In the absence of definitive law to the contrary, courts generally consider domain names to be "general intangibles" under the Uniform Commercial Code.

A security interest in any property (including general intangibles) attaches only to whatever rights a debtor has in that property and only if that property is properly described in the security agreement. Lenders must take care to determine who owns and controls any domain name intended to be collateral, and that entity must be party to the security agreement. To cover domain names, the collateral description in a security agreement should include "general intangibles"; for additional clarity, that collateral description also could include "domain names" (including a list of specific domain names) and any associated trademarks and goodwill.

To perfect a security interest in general intangibles, a lender must file a proper financing

PEOPLE +

PRACTICES +

INDUSTRIES +

COOKIE SETTINGS

2:07:21 PM 5/25/2021
https://www.mcguirewoods.com/client-resources/Alerts/2018/2/Enforcing-a-Security-Interest-in-Domain-Names



| | | | |
|---|---|---|---|
| + | manwha/ | 50.00 HNS | 25 May 2021 |
| + | h2/ | 8,000.00 HNS | 25 May 2021 |
| + | aholic/ | 199.00 HNS | 25 May 2021 |
| + | webscraper/ | 66.00 HNS | 25 May 2021 |
| + | sitebuilders/ | 50.00 HNS | 25 May 2021 |
| + | averesch/ | 30.00 HNS | 25 May 2021 |
| + | xn--e77hakb/ (ΕΛΕΑ) | 1,654.00 HNS | 25 May 2021 |
| + | blotter/ | 31.00 HNS | 25 May 2021 |
| + | thepirate-day/ | 8.00 HNS | 25 May 2021 |
| + | livecoding/ | 45.00 HNS | 25 May 2021 |
| + | liveprice/ | 35.00 HNS | 25 May 2021 |
| + | umng/ | 5.00 HNS | 25 May 2021 |
| + | bancocajasocial/ | 10.00 HNS | 25 May 2021 |

● Connect to Handshake DNS

6:11:55 PM 5/25/2021

Namebase Learning Center

Namebase.io    Namer Community    Leave Feedback

Search...

English

Welcome

HOW TO

Create Handshake websites

Use Handshake names

Access Handshake names

Get Handshake names

Buy Handshake coins (HNS)

HANDSHAKE

About Handshake

Handshake auction

HNS coin economics

Community

Mining HNS

Stats

Powered by GitBook

CONTENTS

Handshake

True name ownership

  Complete control

  Renewal fees

Endless top-level domains

  Unrestricted

  Any name

  Existing domains

Unstoppable and private

  Uncensorable

  Privacy preserving

A more secure internet

  Replacing CAs

More

# About Handshake

Handshake decentralizes the root DNS zone and improves security of the internet

## Handshake



Handshake is a naming protocol that's backwards compatible with the existing DNS system. It does not replace the DNS protocol, but instead expands the root zone file where TLD ownership information is stored by adding a distributed and decentralized blockchain-based system that no one controls and anyone can use. This allows for a root zone that is uncensorable, permissionless, and free of gatekeepers like ICANN.

Every peer in the Handshake network cryptographically validates and manages the root zone, which completely removes the need for the Certificate Authority system (CAs). Names are logged on the



**CONTENTS**

Handshake
- True name ownership
  - Complete control
- Endless top-level domains
  - Unrestricted
  - Any name
  - Existing domains
- Unstoppable and private
  - Uncensorable
  - Privacy preserving
- A more secure internet
  - Replacing CAs
- More

Every peer in the Handshake network cryptographically validates and manages the root zone, which completely removes the need for the Certificate Authority system (CAs). Names are logged on the Handshake blockchain, which is essentially one big distributed zone file to which anyone can add an entry.

| | Ownership | Fees | Domain Types | Security | Privacy | Censorship |
|---|---|---|---|---|---|---|
| **Traditional DNS** | Leasing only | Annual leasing | Only second-level domains from ~1,500 TLDs (.com, .net, etc.) | Low (Relies on Certificate Authorities) | Low (Ownership info readily solicited) | Easily censorable and/or seized |
| **Handshake DNS** | Full ownership | One-time purchase (+ nominal biennial fee) | Unlimited TLDs, including foreign characters and emojis | High (Based on distributed trustless system) | High (Anonymous & encrypted ownership info) | Censorship and temper resistant |

## True name ownership

In the existing internet infrastructure, no one actually owns their name. Namespaces are controlled by centralized organizations such as ICANN, Verisign, Facebook, Twitter, and Google, who can delete and take away your domain, name, account, and/or identity at will.

Current domain registrars have built their businesses on leasing models, charging website owners an annual fee to rent a subdomain from the registrars' top-level domains. These fees are subject to price hikes and recently ICANN was in the spotlight for approving a deal that would have removed price caps from protected TLDs like .org. Furthermore, if a website is deemed to be harmful, even wrongly, internet service providers can block it, and domain registrars can seize its domain.

## Complete control

Handshake name owners have complete control over their data and can use their TLDs as they wish —



≡ CONTENTS

Handshake

True name ownership

Complete control

Renewal fees

Endless top-level domains

Unrestricted

Any name

Existing domains

Unstoppable and private

Uncensorable

Privacy preserving

A more secure internet

Replacing CAs

More

Handshake domain names provide true ownership, which means there are no yearly rental fees. Handshake TLD owners need only submit a biennial "heartbeat transaction" (a mining fee) to prove they still have access to their name. Otherwise, the name will revert to the "auction-able names" pile. However, if you use Namebase you don't need to remember to perform these transactions because our system does this automatically for you.

## Endless top-level domains 🔗

At the root of the DNS hierarchy is a file called the root zone where top-level domain ownership info is recorded. This root zone is managed by ICANN, who determines what top-level domains are allowed. In other words, the **entire** traditional domain name system is controlled at the root by a single entity, ICANN. ICANN charges a $185,000 evaluation fee for new TLD applications, which may or may not get approved, thus artificially restricting the availability of domains for website owners and developers.

### Unrestricted

By contrast, anyone can register Handshake names. They are distributed through public decentralized Handshake name auctions that are open to anyone, and the market determines the price of any given TLD, not Namebase, Handshake, or ICANN.

### Any name





Handshake names can be virtually anything, from English letters and decimal numbers to Chinese characters and even emojis! They can be used like a traditional TLD with a subdomain (my.home/, my.家/, my.😀/) or as a standalone name (home/, 家/, 😀/).

## Existing domains

All of the ~1,500 TLDs that already exist in the ICANN root zone (e.g. .com, .org, .io) are reserved for backwards-compatibility, and can be claimed by the owners of those names. This means that you can use Handshake domains without disrupting usual access to traditional domains like .com. Additionally, the top 100,000 most visited websites as determined by Alexa are also reserved for their owners (e.g. bitcoin/ on Handshake is set aside for the owner of bitcoin.com, and google/ is set aside for Google). You can see the full list of already claimed Handshake names on dns.live.

If you own an Alexa top 100k website, you can use these instructions to claim your name.

≡ CONTENTS

Handshake

True name ownership
    Complete control
    Renewal fees
Endless top-level domains
    Unrestricted
    Any name
    Existing domains
Unstoppable and private
    Uncensorable
    Privacy preserving
A more secure internet
    Replacing CAs
More

English

Welcome

HOW TO

Create Handshake websites

Use Handshake names

Access Handshake names

Get Handshake names

Buy Handshake coins (HNS)

HANDSHAKE

About Handshake

Handshake auction

HNS coin economics

Community

Mining HNS

Stats

Handshake whitepaper

Handshake Github

Powered by GitBook

6:15:09 PM 5/25/2021



CONTENTS

Handshake

True name ownership

Complete control

Renewal fees

Endless top-level domains

Any name

Existing domains

Unstoppable and private

Uncensorable

Privacy preserving

A more secure internet

Replacing CAs

More

## Unstoppable and private

Although the entire world relies on DNS infrastructure, only a few organizations at the top of the hierarchy control it. The centralized nature of internet names makes it trivial for governments and institutions to censor websites and content through DNS filtering and redirection. Turkish citizens were banned from Wikipedia for almost four years and are still blocked from the encrypted email provider ProtonMail. Iran recently censored Facebook and Twitter before shutting off their Internet entirely, and the services blocked in China are legion, including Facebook, Twitter, and Google.

The current centralized nature of internet names also results in privacy loss. Even if your domain registrar offers WHOIS protections, your ownership information is stored in centralized databases which can be subpoenaed from a domain registrar. This makes it difficult for people to create politically sensitive websites without compromising their safety. Malicious actors can spy on and tamper with your browsing activity, and DNS providers, including ISPs, can collect and sell your web browsing history. As a workaround, people resort to VPNs and centralized resolvers like Cloudflare's 1.1.1.1 which can be shut down at any time (and still require trusting the VPNs and resolvers themselves).

## Uncensorable 🔗

Handshake ensures DNS records can be modified only by the name's owner, which prevents Handshake domains from being censored or maliciously redirected. Handshake DNS data is distributed across all the nodes in its blockchain network instead of being housed on a single centralized server. As long as you can connect to any node in the distributed network, you'll be able to resolve Handshake names, making Handshake names virtually impossible to censor.

## Privacy preserving

Your privacy is protected when you register a Handshake domain because no personal information is required. Ownership of names is determined by public-key cryptography, so it's easy to verify name



**CONTENTS**

Handshake

True name ownership

  Complete control

  Renewal fees

Endless top-level domains

  Any name

  Existing domains

Unstoppable and private

  Uncensorable

  Privacy preserving

A more secure internet

  Replacing CAs

More

**Privacy preserving**

Your privacy is protected when you register a Handshake domain because no personal information is required. Ownership of names is determined by public-key cryptography, so it's easy to verify name owners by having them sign a message with their private key. Privacy is a core feature of Handshake names; there is no WHOIS lookup or any other public database where ownership or contact information can be accessed. Unlike traditional domain registrars, Namebase does not charge annual fees to keep your personal details away from prying eyes.

It is possible to register Handshake names on Namebase **completely** **privately** without revealing any personal information.

## A more secure internet 🔗

Browsers trust certificate authorities to prove that websites are who they say they are. However, certificate authorities have sometimes compromised the security of SSL (Secure Sockets Layer) is tech that protects transmitted data from being read or modified) by issuing bad certificates or cooperating with governments to spy on and censor traffic. Insecure websites put everyone at risk. Vint Cerf, the "Father of the Internet," expands on this in his article about self-authenticating identifiers.

Your browser encrypts traffic to websites using TLS (Transport Security Layer), which relies on public key cryptography. Public key cryptography is a method of asymmetric encryption using a pair of keys: a public key and a private key pair (as opposed to symmetric encryption with only one key). The public key is shared publicly and is used to verify signatures. The private key is used to decrypt messages encrypted by the public key. The private key is never shared.

When the browser makes an HTTPS request to Google, it initiates a TLS Handshake with Google and receives Google's public key. The browser then uses Google's public key to verify that the rest of the





In reveal

Auction over

## Bid history

| Bid | Date | Bid amount + added blind | Lockup amount |
|-----|------|--------------------------|---------------|
| 41 | Feb 26 | 200,000.00 HNS + 0.00 HNS | 200,000.00 HNS |
| 40 | Feb 26 | 110,000.00 HNS + 0.00 HNS | 110,000.00 HNS |
| 39 | Feb 26 | 0.40 HNS + 0.00 HNS | 0.40 HNS |
| 38 | Feb 26 | 1.00 HNS + 0.00 HNS | 1.00 HNS |
| 37 | Feb 26 | 588,785.49 HNS + 499,998.00 HNS | 1,088,783.49 HNS |
| 36 | Feb 26 | 50,000.00 HNS + 50,000.00 HNS | 100,000.00 HNS |
| 35 | Feb 25 | 0.40 HNS + 0.00 HNS | 0.40 HNS |

● Connect to Handshake DNS

6:19:55 PM 5/25/2021









9:07:49 AM 5/26/2021                                      https://opensea.io/collection/domain-names



9:09:12 AM 5/26/2021











10:38:30 AM 5/26/2021
https://opensea.io/assets/0x2a187453064356c898cae034eaed119e1663acb8/56773910964530795207934407703285271591468256656022006085755075416179889584383







No posts

Home    Tracking    Contact Us    Products & Services ▾

INDUSTRY PARTNERS

## Package Tracking

Track your shipments here. Simply enter the shipment tracking number to receive up-to-date status and delivery confirmation for your valuable and time-sensitive letters and packages. Our system tracks all packages sent via DHL, FedEx, and USPS —easy, fast, and accurately.

ENTER A TRACKING NUMBER    **TRACK**

**ADDRESS**
SHIP AND MORE SAHARA
8465 W Sahara Ave Suite 111
Las Vegas, NV 89117

**CONTACT**
PH: 702.476.1516
FX: 702.476.2302
EM: shipmoresahara@gmail.com

**STORE HOURS**

| TUE - May 25 | WED - May 26 | THU - May 27 | FRI - May 28 | SAT - May 29 | SUN - May 30 | MON - May 31 |
|---|---|---|---|---|---|---|
| 8:00 AM | 8:00 AM | 8:00 AM | 8:00 AM | 9:00 AM | Closed | 8:00 AM |
| 6:00 PM | 6:00 PM | 6:00 PM | 6:00 PM | 2:00 PM | | 6:00 PM |

Copyright 2021 by SHIP AND MORE SAHARA          Website By RS Websites          Privacy Statement    |    Terms Of Use    |    Login

1:00:07 PM 5/25/2021                                                        https://www.shipmoresahara.com/





Home | Tracking | Contact Us | Products & Services ▾

## Private Mailbox Rental Service In Las Vegas, NV

### Safety, Security & Convenience

Receiving mail and packages at your home or business can be challenging (and potentially risky) for a number of reasons. Here are a few to consider:

› Identity thieves can find a treasure-trove of information about you by stealing letters directly from your home mailbox.

› UPS, FedEx, DHL and the United States Postal Service often leave packages on your porch or doorstep — making it easy for thieves to steal them — package theft like this is one of the fastest-growing crimes in the US.

› How many times have you been waiting for an important letter or package and find out the driver did not deliver it because he needed your signature — but you were at work or out shopping? Remember how tough it is to find that package?

› If you travel, what happens to your mail and packages while you're gone?

› Do you run a business from your home? A residential address does not always give the best impression to clients.

Join the 21st Century and rent a private mailbox at **SHIP AND MORE SAHARA**. Renting a private mailbox is the most efficient way to receive your mail and packages. Small office and home office business operators have used private mailboxes for decades to help manage their business. Private citizens use them for safety, security, and convenience.

### Why rent a Private Mailbox?

› Use a **Street Address** instead of a residential address or P.O. Box — better for business and personal mail and packages.

› **Free package receiving** — We accept packages and mail from the Post Office, UPS, FedEx, DHL, and couriers — never miss a delivery again! We'll sign for it and keep it safe until you can pick it up.

› Free "Mail Check" — Call ahead to see if you have mail — no wasted trips.

› **Email & text notification**—We can email or text you when that important letter or package is delivered.

› **Mail Forwarding** — Do you travel and fret about your mail piling up? We can forward it to you overnight, weekly, monthly, or on demand.

› **Anonymity & Privacy** — Your information is safe with us.

› **Permanent Address** — Do you move frequently? Tired of your mail "chasing" you? Problem solved.

› **Separate your Business from your Personal mail** — If you run a business from your home, it's a good idea to have a separate business address.

| | |
|---|---|
| **To:** | Unstoppable Domains, Inc. (nyustmp@ladas.com) |
| **Subject:** | U.S. Trademark Application Serial No. 88807913 - .WALLET - 1T20731075 |
| **Sent:** | May 28, 2021 02:00:59 PM |
| **Sent As:** | ecom113@uspto.gov |
| **Attachments:** | |

### United States Patent and Trademark Office (USPTO)

## USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on **May 28, 2021** for
### U.S. Trademark Application Serial No. 88807913

Your trademark application has been reviewed by a trademark examining attorney. As part of that review, the assigned attorney has issued an official letter that you must respond to by the specified deadline or your application will be abandoned. Please follow the steps below.

**(1) Read the official letter.**

**(2) Direct questions** about the contents of the Office action to the assigned attorney below.

/Kim Teresa Moninghoff/
Examining Attorney
Law Office 113
Phone:  571-272-4738
Email:  kim.moninghoff@uspto.gov

Direct questions about navigating USPTO electronic forms, the USPTO website, the application process, the status of your application, and/or whether there are outstanding deadlines or documents related to your file to the Trademark Assistance Center (TAC).

**(3) Respond within 6 months** (or earlier, if required in the Office action) from **May 28, 2021**, using the Trademark Electronic Application System (TEAS).  The response must be received by the USPTO before midnight **Eastern Time** of the last day of the response period.  See the Office action for more information about how to respond

## GENERAL GUIDANCE

·   **Check the status** of your application periodically in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

·   **Update your correspondence email address**, if needed, to ensure you receive important USPTO notices about your application.

·   **Beware of misleading notices sent by private companies about your application.**  Private companies not associated with the USPTO use public information available in trademark registrations to mail and email trademark-related offers and notices – most of which require fees. All **official USPTO correspondence** will only be **emailed from the domain "@uspto.gov."**

# EXHIBIT B

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Thursday, December 9, 2021 06:09 PM |
| **To:** | nyustmp@ladas.com ; UnstoppableDomains@tmdocket.us |
| **Cc:** | DPrahl@ladas.com ;  YAbutouq@ladas.com ;  MKirkorian@ladas.com ;  TJones@ladas.com |
| **Subject:** | Official USPTO Notification: U.S. Trademark SN 88807913 -- Docket/Reference No. 1T20731075 |

OFFICIAL USPTO NOTICE OF ABANDONMENT

**TRADEMARK APPLICATION ABANDONED FAILURE TO TIMELY RESPOND TO OFFICE ACTION**

**U.S. Application Serial No.** 88807913
**Mark:**  .WALLET
**Owner:**  Unstoppable Domains, Inc.
**Docket/Reference No.** 1T20731075

**Issue Date:**  December 09, 2021

**The application above is abandoned** because we did not receive a response to the previous Office action within the six-month response period.

If you did not receive the Office action or if the delay in filing your response was unintentional, you can file a Petition to Revive Abandoned Application - Failure to Respond Timely to Office Action form. **You must file the petition within two months of the issue date of this notice. The petition must include the following:**

(1) A signed statement by someone with firsthand knowledge of the facts, stating that the delay in responding by the due date was unintentional;

(2) A complete response to the Office action if the Office action was received, or, if the Office action was not received, a clear statement of this fact; and

(3) A petition fee.

If you have proof that the application was abandoned due to USPTO error, you can file a Request for Reinstatement of the application and include the proof (such as a copy of an email confirmation issued by the USPTO that includes the date of receipt and a summary of the online submission). You must file the request **within two months of the issue date of this notice**. There is no fee for this request.

For more information on filing a petition, see our webpage on petitions.

For questions about this notice, filing a petition, or filing a request for reinstatement, contact the Trademark Assistance Center at 1-800-786-9199 (select option 1) or at TrademarkAssistanceCenter@uspto.gov.

View this notice and other documents for this application online in the Trademark Status and Document Retrieval (TSDR) database.

# EXHIBIT C

**To:** DENNIS S. PRAHL(nyustmp@ladas.com)

**Subject:** U.S. Trademark Application Serial No. 90886517 - WALLET - 1T21744447

**Sent:** May 23, 2022 11:23:20 AM EDT

**Sent As:** tmng.notices@uspto.gov

**Attachments**

1a._Video_excerpt
1b._Video_excerpt
2a._Applicant_website
2b._Applicant_website
2c._Applicant_website
2d._Applicant_website
2e._Applicant_website
2f._Applicant_website
2h._Applicant_website
2g._Applicant_website
2i._Applicant_website
2j._Applicant_website
2k._Applicant_website
2l._Applicant_website
3._Cryptocurrency_Wallet_Guide
4a._Mailbox_website
4b._Mailbox_website
4c._Mailbox_website

### United States Patent and Trademark Office (USPTO)
### Office Action (Official Letter) About Applicant's Trademark Application

**U.S. Application Serial No.** 90886517

**Mark:** WALLET

**Correspondence Address:**
DENNIS S. PRAHL
LADAS & PARRY LLP
1040 AVENUE OF THE AMERICAS
NEW YORK NY 10018 UNITED STATES

**Applicant:** Unstoppable Domains, Inc.

**Reference/Docket No.** 1T21744447

**Correspondence Email Address:** nyustmp@ladas.com

# NONFINAL OFFICE ACTION

**The USPTO must receive applicant's response to this letter within <u>six months</u> of the issue date below or the application will be <u>abandoned.</u>** Respond using the Trademark Electronic Application System (TEAS). A link to the appropriate TEAS response form appears at the end of this Office action.

**Issue date:**  May 23, 2022

The referenced application has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to the issues below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

## <u>Search Results</u>

The trademark examining attorney searched the USPTO database of registered and pending marks and found no conflicting marks that would bar registration under Trademark Act Section 2(d). 15 U.S.C. §1052(d); TMEP §704.02.  However, registration is refused for the following reason.

### <u>Summary of Issues Applicant Must Address</u>
- Section 2(e)(1) Refusal - Merely Descriptive
- Requirement for Applicant's Domicile Address

## <u>ADVISORY – Mark Amendment</u>

The applicant's services are identified as domain name registration services and the attached screenshots from a video featured on the applicant's website and an additional printout from the applicant's website, *see Atchs. 1a-b, 2l*, indicate that the applicant intends to register domain names featuring .WALLET (*i.e.*, the mark preceded by a dot (".") as a TLD for those domain names).

Therefore, the applicant is advised that if the applicant submits a specimen showing the mark used with the leading dot, registration will be refused because the mark in the drawing is not "a substantially exact representation of the mark" on the specimen, and is a material alteration of the mark.  *See* 37 C.F.R. §§2.51(a)-(b), 2.72(a)-(b); TMEP §§807.12(a), 807.14

Specifically, adding a dot (".") before the applied-for mark would be a material change because the resulting matter, ".WALLET," when used in connection with applicant's domain name registration services, would create the impression that the mark is a generic top-level domain (gTLD), such as ".com" or ".net."  Adding this dot to the mark would not constitute mere extraneous, non-distinctive punctuation, but rather would materially change its overall commercial impression. *See* TMEP §§807.12(a)(i), 1215.08(c).

## <u>Section 2(e)(1) Refusal – Merely Descriptive</u>

The applicant has applied for registration of the mark WALLET in standard character form for:

International Class 045: Domain name registration services

Registration is refused because the applied-for mark merely describes a characteristic of applicant's services.  Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq.*

A mark is merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose, or use of an applicant's goods and/or services. TMEP §1209.01(b); *see, e.g.*, *In re TriVita, Inc.*, 783 F.3d 872, 874, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015) (quoting *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004)); *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005) (citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 543 (1920)).

"Whether consumers could guess what the product [or service] is from consideration of the mark alone is not the test." *In re Am. Greetings Corp.*, 226 USPQ 365, 366 (TTAB 1985). The question is **not** whether someone presented only with the mark could guess what the goods and/or services are, but **"whether someone who knows what the goods and[/or] services are will understand the mark to convey information about them."** *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1254, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012) (quoting *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002)); *In re Mueller Sports. Med., Inc.*, 126 USPQ2d 1584, 1587 (TTAB 2018).

The attached printouts from the applicant's website, *see Atchs. 2a-l*, indicate that the applicant does not provide traditional domain name registration services, of the type associated with the Internet Corporation for Assigned Names and Numbers (ICANN), but instead provides for registration of alternative-root domains, which the applicant also refers to as NFT (non-fungible token) domains.  The applicant's website indicates that these domain names are intended for use as "[p]ayment address[es] for wallets," also referred to as "[c]rypto wallet[s]," instead of providing a separate cryptocurrency address for payments.  The applicant's website also indicates that it provides its customers "self custody wallets to hold domains."

The applicant is also referred to the attached blog article that defines cryptocurrency wallets and explains how they facilitate payments. Ameer Rosic, BlockGeeks, *Cryptocurrency Wallet Guide: A Step-By-Step Tutorial*, https://blockgeeks.com/guides/cryptocurrency-wallet-guide/ (viewed on May-18-2022, 10:00 EDT), *Atch. 3*.  Specifically, the article includes the following information:

> Cryptocurrency wallets are software programs that store your public and private keys and interface with various blockchains so users can monitor their balance, send money and conduct other operations. When a person sends you bitcoins or any other type of digital currency, they are essentially signing off ownership of the coins to your wallet's address. To be able to spend those coins and unlock the funds, the private key stored in your wallet must match the public address the currency is assigned to. If the public and private keys match, the balance in your digital wallet will increase, and the senders will decrease accordingly. There is no actual exchange of real coins. The transaction is signified merely by a transaction record on the blockchain and a change in balance in your cryptocurrency wallet.

Thus, purchasers who encounter WALLET used in association with the identified services would immediately understand that applicant's services are intended to facilitate cryptocurrency payments, by functioning as a payment address for cryptocurrency wallets (a shortcut to the keys stored in

cryptocurrency wallets), ands thus, WALLET merely describes this characteristic of the applicant's services.

Accordingly, the proposed mark is merely descriptive, and registration is refused on the Principal Register under Section 2(e)(1).

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration. **Please note that informal communications (phone and email) may not be used to request advisory opinions as to the likelihood of overcoming a substantive refusal.** TMEP §709.05. To properly introduce Internet evidence into the record, an applicant must provide (1) an image file or printout of the downloaded webpage, (2) the date the evidence was downloaded or accessed, and (3) the complete URL address of the webpage. *See In re I-Coat Co., LLC*, 126 USPQ2d 1730, 1733 (TTAB 2018); TBMP §1208.03; TMEP §710.01(b).

If applicant responds to the refusal, applicant must also respond to the requirement set forth below.

## Requirement for Applicant's Domicile Address

**Applicant must clarify its domicile street address** because the domicile address of record is for a third-party commercial mail receiving agency and does not appear to be applicant's principal place of business. *See* 37 C.F.R. §§2.11(b), 2.189; TMEP §601.01(b)(1). A domicile address for a juristic applicant must identify the principal place of business, which is the juristic applicant's headquarters where its senior executives or officers ordinarily direct and control the entity's activities. *See* 37 C.F.R. §2.2(o)-(p); TMEP §803.05(a).

In this case, the application record lists applicant as a juristic entity and specifies applicant's domicile address as follows: 8465 W Sahara Ave, Ste 111 Unit #1017, Las Vegas NV 89117. This address has been identified as a commercial mail receiving agency by the U.S. Postal Service Coding Accuracy Support System (CASS) and thus does not appear to be applicant's headquarters where its senior executives or officers ordinarily direct and control the entity's activities. *See* 37 C.F.R. §2.2(o)-(p); TMEP §601.01(b)(1). *See also Atchs. 4a-c.* Commercial mail receiving agencies are private businesses that accept mail from the U.S. Postal Service on behalf of third parties.

**Response options.** Applicant must provide its domicile street address. *See* 37 C.F.R. §2.32(a)(2), 2.189; TMEP §803.05. Alternatively, applicant may provide documentation showing that the listed U.S. domicile address is, in fact, applicant's domicile. TMEP §601.01(b)-(b)(1), 803.05(a); *see* 37 C.F.R. §2.11(b).

**To provide applicant's domicile street address.** After opening the correct Trademark Electronic Application System (TEAS) response form and entering the serial number, (1) answer "yes" to question #5 and click "Continue;" (2) on the "Owner Information" page, in the "Domicile Address" field, uncheck the box stating the domicile and mailing address are not the same; and (3) below the checkbox provide applicant's domicile street address. Applicant's domicile street address will be hidden from public view if it is entered into the "Domicile Address" field. However, any street address listed in the "Mailing Address" field will be publicly viewable.

**To provide documentation to support applicant's U.S. domicile address.** Applicant should provide the most recent documentation showing that the address is the applicant's business headquarters, for

example one of the following: (1) the most recent final annual or quarterly report or other similar report; or (2) a current certificate of good standing for the corporation or other business entity issued by a federal or state government agency. TMEP §601.01(b)-(b)(1); *see* 37 C.F.R. §2.11(b). Submitted documentation must show the name, listed domicile address, and the date of the document but should redact other personal and financial information.

To provide this documentation, open the correct TEAS response form and enter the serial number, answer "yes" to question #3, and on the "Additional Statement(s)" page, below the "Miscellaneous Statement" field, click the button below the text box to attach documentation to support the U.S. street address.

**How to respond.  Click to file a response to this nonfinal Office action**.

For questions about this Office action, please call or email the assigned trademark examining attorney (email preferred).  The USPTO does **not** accept emails as responses to Office actions; however, emails can be used for informal communications and are included in the application record. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.


/Kim Teresa Moninghoff/
Kim Teresa Moninghoff
Trademark Examining Attorney
Law Office 113
(571) 272-4738
kim.moninghoff@uspto.gov


# RESPONSE GUIDANCE

- **Missing the response deadline to this letter will cause the application to abandon.** The response must be received by the USPTO before midnight **Eastern Time** of the last day of the response period. TEAS maintenance or unforeseen circumstances could affect an applicant's ability to timely respond.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon**.  If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.



9:19:41 AM 5/18/2022



Introducing Unstoppable Domains NFT Domains

1,037,993 views   Oct 27, 2021   Unstoppable Domains' NFT domains are web
addresses with superpowers. Your NFT domain is your name on the inter... ...more

👍 763   👎 Dislike   ↗ Share   ⊕ Save   •••

Unstoppable Domains
23.5K subscribers

SUBSCRIBE

Comments
357

Please do more educational videos about how UD will work in
the METAVERSE!!! Start the narrative NOW for blockchain...

9:18:49 AM 5/18/2022                    https://www.youtube.com/watch?v=rs-lYFtwqds&t=49s





## Supported Browsers

9:11:08 AM 5/18/2022

Brave ↗     Opera ↗     Chrome ↗     Firefox ↗     Edge ↗



## Applications

Applications that support Unstoppable Domains

[ View Applications ]   [ Submit Your Application ]

**Coinbase Wallet** ⚙ +2
A mobile wallet with crypto payments to Unstoppable…

**Chainlink** 🌐
Connect an Unstoppable Domain to your online identity.

**Cloudflare** 🌐
Make blockchain domains work in any browser with Cloudflare's D…

**Rainbow Wallet** ◉
Rainbow is a fun, simple, and secure Ethereum wallet that mak…

**Bitcoin.com Wallet** ◉
Buy, sell, store, send & receive cryptocurrency with the…

**Blockchain.com** ◉
The world's most popular way to buy, sell, and trade crypto. Trust…

**OpenSea** ◉ +1
A peer-to-peer marketplace for rare domain names and more.

**MyEtherWallet** ▭ +3
An Ethereum wallet for managing, storing, and paying Unstoppabl…

**Trust Wallet** ⚙ +3
Ethereum wallet to store and send payments to Unstoppable…

9:11:26 AM 5/18/2022

## Replace cryptocurrency addresses with a human readable name

To send cryptocurrency, all you need to know is the recipient's NFT domain

Send bitcoin, ethereum, and any other cryptocurrency with just one domain

No more worrying about sending to the wrong address



9:16:52 AM 5/18/2022

## Replace cryptocurrency addresses with a human readable name

To send cryptocurrency, all you need to know is the recipient's NFT domain

Send bitcoin, ethereum, and any other cryptocurrency with just one domain

No more worrying about sending to the wrong address



9:11:43 AM 5/18/2022

## Replace cryptocurrency addresses with a human readable name

To send cryptocurrency, all you need to know is the recipient's NFT domain

Send bitcoin, ethereum, and any other cryptocurrency with just one domain

No more worrying about sending to the wrong address

You get this

9:16:07 AM 5/18/2022

## No Renewal Fees



NFT domains are owned not rented. Buy the domain with a one time registration fee and never worry about renewals again.

The domain is stored in your wallet, just like a cryptocurrency. No one can move it around other than you.

Point your domain to content on a decentralized storage network.

9:12:05 AM 5/18/2022

## Replace cryptocurrency addresses with a human readable name

To send cryptocurrency, all you need to know is the recipient's NFT domain

Send bitcoin, ethereum, and any other cryptocurrency with just one domain

No more worrying about sending to the wrong address



9:16:16 AM 5/18/2022



# FAQ

**Will I be able to transfer my domain?** ⌃

Yes. The domain is stored in your cryptocurrency wallet and can be transferred by you after you mint the name on the blockchain with your wallet.

**Which cryptocurrencies will I be able to use with my domain?** ⌃

We currently support over **282 cryptocurrency addresses** to map to a domain name to make payments easier.

**Does Unstoppable Domains provide you with a wallet?** ⌃

Yes if you mint a domain with our iOS or Android Apps. You are also able to use your own self custody wallets to hold domains.

**How will I be able to view a NFT website?** ⌃

You will need to use a mirroring service, a browser extension or a browser that supports NFT domains.

9:13:26 AM 5/18/2022



domains.

Will I be able to search for and find NFT domain websites on Google or other search engines?   ^

Major search engines do not currently index NFT domain websites. For now, you will be able to
search for them at unstoppabledomains.com, on partner applications that integrate our search
bar, or on blockchain apps that index NFT domain websites.

Are NFT domains part of ICANN / traditional DNS?   ^

No. NFT domains are what's called alternate roots. They are not part of the current DNS.

Will there be some sort of 'whois' record with my personal information associated to my
domain?   ^

Not by default. Sharing 'whois' information is opt in i.e. something that you can choose to do if
you want. Otherwise, your identity will not be publicly known.

How do trademarks work with NFT domains?   ^

Trademark holders with proof of ownership can apply to claim ownership of trademarked names.
If a trademark name has already been sold, then it will be refunded. Note - this process ends
once domains have been distributed. Unstoppable Domains does not have the ability to move a
domain once distribution has occurred.

9:14:23 AM 5/18/2022



**How do payments work with my NFT domain?**

Add your bitcoin, Ethereum, and Zilliqa addresses to your .zil or .crypto domain inside of the 'my domains' section at unstoppabledomains.com. When someone types yourname.zil into a supporting wallet, the wallet looks up that domain on the blockchain, finds the appropriate address, and sends to the address associated with that name.

## Investors

DRAPER ASSOCIATES          boostVC          coinbase VENTURES          Protocol Labs

Join our community

Help Center

9:14:48 AM 5/18/2022



https://blockgeeks.com/guides/cryptocurrency-wallet-guide/#:~:text=A%20cryptocurrency%20wallet%20is%20a,to%20have%20a%20digital%20wallet
at 10:00:27, 05/18/2022



## Contents

What is a Cryptocurrency Wallet?

Enjoy a free lesson from the Blockgeeks Library!

How Do They Work?

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Articles

Videos

N 297    k 297    s 297    297

Use this straightforward guide to learn what a cryptocurrency wallet is, how they work and discover which one's are the best on the market. If you are looking for something a bit more in detail about cryptocurrencies please check out our course on it.

## What is a Cryptocurrency Wallet?

### Enjoy a free lesson from the Blockgeeks Library!



A cryptocurrency wallet is a software program that stores private and public keys and interacts with various blockchain to enable users to send and receive digital currency and monitor their balance. If you want to use Bitcoin or any other cryptocurrency, you will need to have a digital wallet.

## How Do They Work?





Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Multi-currency or single-use?

Millions of people use cryptocurrency wallets, but there is a considerable misunderstanding about how they work. Unlike traditional 'pocket' wallets, digital wallets don't store your currency. In fact, currencies don't get stored in any single location or exist anywhere in any physical form. All that exists are records of transactions stored on the blockchain.

Cryptocurrency wallets are software programs that store your public and private keys and interface with various blockchains so users can monitor their balance, send money and conduct other operations. When a person sends you bitcoins or any other type of digital currency, they are essentially signing off ownership of the coins to your wallet's address. To be able to spend those coins and unlock the funds, the private key stored in your wallet must match the public address the currency is assigned to. If the public and private keys match, the balance in your digital wallet will increase, and the senders will decrease accordingly. There is no actual exchange of real coins. The transaction is signified merely by a transaction record on the blockchain and a change in balance in your cryptocurrency wallet.







Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus





## What are the different types of Cryptocurrency wallets?

There are several types of wallets that provide different ways to store and access your digital currency. Wallets can be broken down into three distinct categories – software, hardware, and paper. Software wallets can be a desktop, mobile or online.

- **Desktop:** wallets are downloaded and installed on a PC or laptop. They are only accessible from the single computer in which they are downloaded. Desktop wallets offer one of the highest levels of security however if your computer is hacked or gets a virus there is the possibility that you may lose all your funds.

- **Online:** wallets run on the cloud and are accessible from any computing device in any location. While they are more convenient to access, online wallets store your private keys online and are controlled by a third party which makes them more vulnerable to hacking attacks and theft.

- **Mobile:** wallets run on an app on your phone and are useful because they can be used anywhere including retail stores. Mobile wallets are usually much smaller and simpler than desktop wallets because of the limited space available on mobile.

- **Hardware:** wallets differ from software wallets in that they store a user's private keys on a hardware device like a USB. Although



Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets

hardware wallets make transactions online, they are stored offline which delivers increased security. Hardware wallets can be compatible with several web interfaces and can support different currencies; it just depends on which one you decide to use. What's more, making a transaction is easy. Users simply plug in their device to any internet-enabled computer or device, enter a pin, send currency and confirm. Hardware wallets make it possible to easily transact while also keeping your money offline and away from danger.



- Paper: wallets are easy to use and provide a very high level of security. While the term paper wallet can simply refer to a physical copy or printout of your public and private keys, it can also refer to a piece of software that is used to securely generate a pair of keys which are then printed. Using a paper wallet is relatively straightforward. Transferring Bitcoin or any other currency to your paper wallet is accomplished by the transfer of funds from your software wallet to the public address shown on your paper wallet. Alternatively, if you want to withdraw or spend currency, all you need to do is transfer funds from your paper wallet to your software wallet. This process, often referred to as 'sweeping,' can either be done manually by entering your private keys or by scanning the QR code on the paper wallet.

## Are Cryptocurrency wallets secure?

Wallets are secure to varying degrees. The level of security depends on the type of wallet you use (desktop, mobile, online, paper, hardware) and the service provider. A web server is an intrinsically riskier environment to keep your currency compared to offline. Online



anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

wallets can expose users to possible vulnerabilities in the wallet platform which can be exploited by hackers to steal your funds. Offline wallets, on the other hand, cannot be hacked because they simply aren't connected to an online network and don't rely on a third party for security.

Although online wallets have proven the most vulnerable and prone to hacking attacks, diligent security precautions need to be implemented and followed when using any wallet. Remember that no matter which wallet you use, losing your private keys will lead you to lose your money. Similarly, if your wallet gets hacked, or you send money to a scammer, there is no way to reclaim lost currency or reverse the transaction. You must take precautions and be very careful!

- **Backup your wallet.** Store only small amounts of currency for everyday use online, on your computer or mobile, keeping the vast majority of your funds in a high-security environment. Cold or offline storage options for backup like Ledger Nano X or paper or USB will protect you against computer failures and allow you to recover your wallet should it be lost or stolen. It will not, however, protect you against eager hackers. The reality is, if you choose to use an online wallet there are inherent risks that can't always be protected against.

- **Update software**. Keep your software up to date so that you have the latest security enhancements available. You should regularly update not only your wallet software but also the software on your computer or mobile.





Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the

- **Add extra security layers.** The more layers of security, the better. Setting long and complex passwords and ensuring any withdrawal of funds requires a password is a start. Use wallets that have a good reputation and provide extra security layers like two-factor authentication and additional pin code requirements every time a wallet application gets opened. You may also want to consider a wallet that offers multisig transactions like Armory or Copay. A multisig or multi-signature wallet requires the permission of another user or users before a transaction can be made.

## Multi-currency or single-use?

Although Bitcoin is by far the most well-known and popular digital currency, hundreds of new cryptocurrencies (referred to as altcoins) have emerged, each with distinctive ecosystems and infrastructure. If you're interested in using a variety of cryptocurrencies, the good news is, you don't need to set up a separate wallet for each currency. Instead of using a cryptocurrency wallet that supports a single currency, it may be more convenient to set up a multi-currency wallet which enables you to use several currencies from the same wallet.

## Are there any transaction fees?

There is no straightforward answer here.

In general, transaction fees are a tiny fraction of traditional bank fees. Sometimes fees need to be paid for certain types of transactions to network miners as a processing fee, while some transactions don't have any fee at all. It's also possible to set your own fee. As a guide, the median transaction size of 226 bytes would result in a fee of 18,080 satoshis or $0.12. In some cases, if you choose to set a low fee,





best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory



your transaction may get low priority, and you might have to wait hours or even days for the transaction to get confirmed. If you need your transaction completed and confirmed promptly, then you might need to increase the amount you're willing to pay. Whatever wallet you end up using, transaction fees are not something you should worry about. You will either pay minuscule transaction fees, choose your own fees or pay no fees at all. A definite improvement from the past!

## Are cryptocurrency wallets anonymous?

Kind of, but not really. Wallets are pseudonymous. While wallets aren't tied to the actual identity of a user, all transactions are stored publicly and permanently on the blockchain. Your name or personal street address won't be there, but data like your wallet address could be traced to your identity in a number of ways. While there are efforts underway to make anonymity and privacy easier to achieve, there are obvious downsides to full anonymity. Check out the DarkWallet project that is looking to beef up privacy and anonymity through stealth addresses and coin mixing.



## Which Cryptocurrency wallet is the best?

There is an ever-growing list of options. Before picking a wallet, you should, however, consider how you intend to use it.

- Do you need a wallet for everyday purchases or just buying and holding the digital currency for an investment?

- Do you plan to use several currencies or one single currency?

- Do you require access to your digital wallet from anywhere or only

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

from home?

- Take some time to assess your requirements and then choose the most suitable wallet for you.

## Atomic Wallet

Atomic Wallet is a new multi-asset custody-free solution for secure storage and management of BTC, ETH, [XLM](#), XRP, LTC, and over 300 other coins and tokens. The crypto-assets and features are regularly updated. Private keys are securely encrypted on a user's device, so one has full control over their funds. The desktop app is available for Windows, MacOS, Ubuntu, Debian and Fedora. Private alpha versions of Android and IOS mobile apps will be released in October, 2018. Atomic Wallet is a secure all-in-one, non-custodial cryptocurrency storage with a smooth and comprehensive interface. The wallet supports [Atomic Swaps](#), a cutting-edge feature that helps users significantly save on fees. Atomic wallet also enables users to buy [cryptocurrency with USD and EUR and exchange](#) their assets at the best rates via Changelly or ShapeShift.

- **Pros**: Handy interface, Optimum privacy & security, Decentralized, Multi-currency, Custody-free, Built-in Exchange, Bank cards accepted, 24/7 instant support.

- **Cons**: Not all coins support Atomic swaps yet

## Bread Wallet

Bread Wallet is a simple mobile Bitcoin digital wallet that makes sending bitcoins as easy as sending an email. The wallet can be downloaded from the App Store or Google Play. Bread Wallet offers a





Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

standalone client, so there is no server to use when sending or receiving bitcoins. That means users can access their money and are in full control of their funds at all times. Overall, Bread Wallet's clean, lightweight design and commitment to continually improve security, make the application safe, fast and a pleasure to use for both beginners and experienced users alike.

- **Pros:** Good privacy & security, beginner-friendly, simple & clean, open-source software, free.

- **Cons:** No web or desktop interface, lacks features, hot wallet.

## Mycelium

Advanced users searching for a [bitcoin](#) mobile digital wallet, should look no further than mycelium. The Mycelium mobile wallet allows iPhone and Android users to send and receive bitcoins and keep complete control over bitcoins. No third party can freeze or lose your funds! With enterprise-level security superior to most other apps and features like cold storage and encrypted PDF backups, an integrated QR-code scanner, a local trading marketplace and secure chat amongst others, you can understand why Mycelium has long been regarded as one of the best wallets on the market.

- **Pros:** Good privacy, advanced security, feature-rich, open-source software, free

- **Cons:** No web or desktop interface, hot wallet, not for beginners

## Exodus

Exodus is a relatively new and unknown digital wallet that is currently only available on the desktop. It enables the storage and [trading](#) of





Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

only available on the desktop. It enables the storage and trading of Bitcoin, Ether, Litecoins, Dogecoins, and Dash through an incredibly easy to use, intuitive and beautiful interface. Exodus also offers a very simple guide to backup your wallet. One of the great things about Exodus is that it has a built-in shapeshift exchange that allows users to trade altcoins for bitcoins and vice versa without leaving the wallet.

- **Pros:** Good privacy & security, beginner-friendly, intuitive, easy to use, in-wallet trading, supports multiple currencies, open-source software, free.

- **Cons:** Hot wallet, no web interface or mobile app



## Copay

Created by Bitpay, Copay is one of the best digital wallets on the market. If you're looking for convenience, Copay is easily accessed through a user-friendly interface on desktop, mobile or online. One of the best things about Copay is that it's a multi-signature wallet so friends or business partners can share funds. Overall, Copay has something for everyone. It's simple enough for entry-level users but has plenty of additional geeky features that will impress more experienced players as well.

- **Pros:** Good privacy & security, multisig transactions, multiple platforms & devices, multiple wallet storage, beginner-friendly, open-source software, free

- **Cons:** Can be slow & unresponsive, limited user support



## Jaxx

Jaxx is a multi-currency Ether, Ether Classic, Dash, DAO, Litecoin, REP,

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Zcash, Rootstock, Bitcoin wallet and user interface. Jaxx has been designed to deliver a smooth bitcoin and Ethereum experience. It is available on a variety of platforms and devices (Windows, Linux, Chrome, Firefox, OSX, Android mobile & tablet, iOS mobile & tablet) and connects with websites through Firefox and Chrome extensions. Jaxx allows in wallet conversion between Bitcoin, Ether and DAO tokens via Shapeshift and the import of Ethereum paper wallets. With an array of features and the continual integration of new currencies, Jaxx is an excellent choice for those who require a multi-currency wallet.

- **Pros:** Good privacy & security, Multi-currency, wallet linking across multiple platforms, great user support, feature-rich, user-friendly, free.

- **Cons:** The code is not open source, can be slow to load.



## Armory

Armory is an open-source Bitcoin desktop wallet perfect for experienced users that place emphasis on security. Some of Armory's features include cold storage, multi-signature transactions, one-time printable backups, multiple wallets interface, GPU-resistant wallet encryption, key importing, key sweeping and more. Although Armory takes a little while to understand and use to its full potential, it's a great option for more tech-savvy bitcoiners looking to keep their funds safe and secure.

- **Pros:** Good privacy, great security features, multi-signature options, solid cold storage options, free.

- **Cons:** Only accessible via the desktop client, not for beginners.



Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus



## Trezor

Trezor is a hardware [bitcoin](#) wallet that is ideal for storing large amounts of bitcoins. Trezor cannot be infected by malware and never exposes your private keys which make it as safe as holding traditional paper money. Trezor is open source and transparent, with all technical decisions benefiting from wider community consultation. It's easy to use, has an intuitive interface and is Windows, OS X, and Linux friendly. One of the few downsides of the Trezor wallet is that it must be with you to send bitcoins. This, therefore, makes Trezor best for inactive savers, investors or people who want to keep large amounts of [bitcoin](#) highly secure.

- **Pros:** Good security & privacy, cold storage, easy to use a web interface, in-built screen, open-source software, beginner-friendly.

- **Cons:** Costs $99, a must-have device to send bitcoins

## Ledger Wallet Nano

The [Ledger Wallet Nano](#)X is a new hierarchical deterministic multisig hardware wallet for bitcoin users that aims to eliminate a number of attack vectors through the use of a second security layer. This tech-heavy description does not mean much to the average consumer, though, which is why I am going to explain it in plain language, describing what makes the Ledger Wallet Nano tick. In terms of hardware, the Ledger Wallet Nano is a compact USB device based on a smart card. It is roughly the size of a small flash drive, measuring 39 x 13 x 4mm (1.53 x 0.51 x 0.16in) and weighing in at just 5.9g.

Pros:



Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets

- Screen/device protected by metal swivel cover

- Multi-Currency support

- 3rd-Party apps can run from the device

- U2F support

- When recovering a wallet from seed, the whole process can be done from the device without even connecting it to a computer!

- Fairly inexpensive (~$65 USD)

**Cons:**

- Not as advanced wallet software (no transaction labeling)

- No ability to create hidden accounts

- No password manager



## Green Address

Green Address is a user-friendly Bitcoin wallet that's an excellent choice for beginners. Green Address is accessible via desktop, online or mobile with apps available for Chrome, iOS, and Android. Features include multi-signature addresses & two-factor authentications for enhanced security, paper wallet backup, and instant transaction confirmation. A downside is that Green Address is required to approve all payments, so you do not have full control over your spending.

- **Pros:** Solid security, multi-platform & device, multi-sig, beginner-friendly, open-source software, free.

- **Cons:** Hot wallet, average privacy, the third party must approve



Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

payments.

## Blockchain (dot) info

Blockchain is one of the most popular Bitcoin wallets. Accessing this wallet can be done from any browser or smartphone. Blockchain.info provides two different additional layers. For the browser version, users can enable two-factor authentication, while mobile users can activate a pin code requirement every time the wallet application is opened. Although your wallet will be stored online and all transactions will need to go through the company's servers, Blockchain.info does not have access to your private keys. Overall, this is a well-established company that is trusted throughout the bitcoin community and makes for a solid wallet to keep your currency.

- **Pros:** Good security, easy to use web & mobile interface, well-known & trusted company, beginner friendly, free.

- **Cons:** Hot wallet, weak privacy, the third-party trust required, has experienced outages.

## Want to start investing in cryptocurrencies? Check out our courses



**Ameer Rosic**

Ameer's the co-founder of blockgeeks. He's an investor and blockchain evangelist, meaning he's all about investing to bring transparency across the world. You can call him a serial entrepreneur with a couple of startups up his sleeve and tonnes of them in his mind. With over 160K subscribers on youtube, Ameer hosts his own show called #ameerapproved, where he talks about entrepreneurship and shares the latest crypto market updates. He has been a contributor to HuffPost, Due.com, Cryptominded, and VentureBeat. His clients are mostly tech startups that are operating on blockchain technology. Right now Ameer's thinking about NFTs and their use cases. He might as well



Buy now



Buy now

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the
best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of
Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets
anonymous?

Which Cryptocurrency wallet is the



talk about it in his next youtube video. You can connect with Ameer on
Linkedin and Twitter.

**Like what you read? Give us one like or share it to your friends and get
+16**

297

newest oldest most voted



## Have questions?

We have built an incredible community of
blockchain enthusiasts from every corner
of the industry. If you have questions, we
have answers!

**ASK COMMUNITY**

**1) Q : What is a cryptocurrency wallet?**

A: A cryptocurrency wallet is a software program that stores private and public keys and interacts with various blockchain
to enable users to send and receive digital currency and monitor their balance.

**2) Q: What are the different types of cryptocurrency wallets?**

1. Desktop
2. Online
3. Mobile
4. Hardware
5. Paper

**3) Q: What is a cryptocurrency desktop wallet ?**

Which cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

3) Q: What is a cryptocurrency desktop wallet?

A: This type of wallet is downloaded and installed on a PC or laptop. They are only accessible from the single computer in which they are downloaded. Desktop wallets offer one of the highest levels of security however if your computer is hacked or gets a virus there is the possibility that you may lose all your funds.

### 4) Q: What is an cryptocurrency online wallet?

A: This type of wallet runs on the cloud and are accessible from any computing device in any location. While they are more convenient to access, online wallets store your private keys online and are controlled by a third party which makes them more vulnerable to hacking attacks and theft.

### 5) Q: What is an cryptocurrency mobile wallet?

A: This type of wallet runs on an app on your phone and are useful because they can be used anywhere including retail stores. Mobile wallets are usually much smaller and simpler than desktop wallets because of the limited space available on a mobile.

### 6) Q: What is a hardware wallet?

A: This type of wallet differs from software wallets in that they store a user's private keys on a hardware device like a USB. Although hardware wallets make transactions online, they are stored offline which delivers increased security. Hardware wallets can be compatible with several web interfaces and can support different currencies; it just depends on which one you decide to use. What's more, making a transaction is easy. Users simply plug in their device to any internet-enabled computer or device, enter a pin, send currency and confirm. Hardware wallets make it possible to easily transact while also keeping your money offline and away from danger.

### 7) Q: What is a paper wallet?

A: This type of wallet are easy to use and provide a very high level of security. While the term paper wallet can simply refer to a physical copy or printout of your public and private keys, it can also refer to a piece of software that is used to securely generate a pair of keys which are then printed.



Like what you're reading?

Join our community and get access to over 50 free video lessons, workshops, and guides like this! No credit card needed!

GET STARTED





What are the different types of Cryptocurrency wallets?

Are Cryptocurrency wallets secure?

Multi-currency or single-use?

Are there any transaction fees?

Are cryptocurrency wallets anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

Armory

anonymous?

Which Cryptocurrency wallet is the best?

Atomic Wallet

Bread Wallet

Mycelium

Exodus

Copay

Jaxx

RELATED GUIDES



Andrew Zapotochny

Best Hardware Wallets in 2022: Blockgeeks Crypto Awards

89



Matthew Baggetta

How To Invest in Cryptocurrencies: The Ultimate Beginners

1,776

Ameer Rosic

The Best Cryptocurrency Exchanges: [Most

979

What is Cryptocurrency?

Ameer Rosic

What is Cryptocurrency? [Everything You Need

12,466



Buy now

Armory



**Block**geeks

© 2022 Blockgeeks

Crypto Investment
School
Contribute
Terms

Course Library
Partnerships
FAQ
Affiliates

Guides
Infographics
Support
Contact Us

Articles
Advertise With Us
Privacy
Authors







### Private Mailbox Rental Service In Las Vegas, NV

#### Safety, Security & Convenience

Receiving mail and packages at your home or business can be challenging *(and potentially risky)* for a number of reasons. Here are a few to consider:

> Identity thieves can find a treasure-trove of information about you by stealing letters directly from your home mailbox.

> UPS, *FedEx, DHL,* and the *United States Postal Service* often leave packages on your porch or doorstep — making it easy for thieves to steal them — package theft is one of the fastest-growing crimes in the US.

> How many times have you been waiting for an important letter or package and find out the driver did not deliver it because he needed your signature — but you were at work or out shopping? Remember how tough it is to find that package?

> If you travel, what happens to your mail and packages while you're gone?

> Do you run a business from your home? A residential address does not always give the best impression to clients.

Join the 21st Century and rent a private mailbox at **SHIP AND MORE SAHARA**. Renting a private mailbox is the most efficient way to receive your mail and packages. Small office and home office business operators have used private mailboxes for decades to help manage their business. Private citizens use them for safety, security, and convenience.

#### Why rent a Private Mailbox?

> Use a **Street Address** instead of a residential address or P.O. Box — better for business and personal mail and packages.

> **Free package receiving** — We accept packages and mail from the Post Office, UPS, FedEx, DHL, and couriers — never miss a delivery again! We'll sign for it and keep it safe until you can pick it up.

> **Free "Mail Check"** — Call ahead to see if you have mail — no wasted trips.

> **Email & text notification** —We can email or text you when that important letter or package is delivered.

> **Mail Forwarding** — Do you travel and fret about your mail piling up? We can forward it to you overnight, weekly, monthly, or on demand.

> **Anonymity & Privacy** — Your information is safe with us.

> **Permanent Address** — Do you move frequently? Tired of your mail "chasing" you? Problem solved.

> **Separate your Business from your Personal mail** — If you run a business from your home, it's a good idea to have a separate business address.

**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on May 23, 2022 for
**U.S. Trademark Application Serial No.  90886517**

A USPTO examining attorney has reviewed your trademark application and issued an Office action.  You must respond to this Office action in order to avoid your application abandoning.  Follow the steps below.

**(1)  Read the Office action**. This email is NOT the Office action.

**(2)  Respond to the Office action by the deadline** using the Trademark Electronic Application System (TEAS). Your response must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response period. Otherwise, your application will be abandoned. See the Office action itself regarding how to respond.

**(3)  Direct general questions** about using USPTO electronic forms, the USPTO website, the application process, the status of your application, and whether there are outstanding deadlines to the Trademark Assistance Center (TAC).

After reading the Office action, address any question(s) regarding the specific content to the USPTO examining attorney identified in the Office action.

# GENERAL GUIDANCE

- **Check the status of your application periodically** in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

- **Update your correspondence email address** to ensure you receive important USPTO notices about your application.

- **Beware of trademark-related scams**. Protect yourself from people and companies that may try to take financial advantage of you. Private companies may call you and pretend to be the USPTO or may send you communications that resemble official USPTO documents to trick you. We will never request your credit card number or social security number over the phone. And all official USPTO correspondence will only be emailed from the domain "@uspto.gov." Verify the correspondence originated from us by using your Serial Number in our database, TSDR, to confirm that it appears under the "Documents" tab, or contact the Trademark Assistance Center.

- **<u>Hiring a U.S.-licensed attorney</u>.** If you do not have an attorney and are not required to have one under the trademark rules, we encourage you to hire a U.S.-licensed attorney specializing in trademark law to help guide you through the registration process. The USPTO examining attorney is not your attorney and cannot give you legal advice, but rather works for and represents the USPTO in trademark matters.

# EXHIBIT D

# .wallet

| From | Wallet <walletdomain@protonmail.com> |
|------|--------------------------------------|
| To   | SDSazer@mintz.com                    |
| Date | Friday, July 8th, 2022 at 1:50 PM    |

Attn: Sam Sazer

It has come to my attention that a letter has been issued by your firm to gateway.io, a registrar of decentralized domains. The letter demands some conditions of gateway regarding the .wallet domain.

I am the owner of .wallet - the REAL .wallet. I would like to take this opportunity to educate you on facts.

Fact 1: the .wallet domain was registered by me in July of 2020. In that same month, a .wallet website was deployed.

Fact 2: a company of the same name (Wallet, Inc.) was registered by me in November 2020

In the summer of 2021, your client copied and modified blockchain code to give themselves stewardship of the .wallet domain (along with 8-10 other names that were previously registered on the original blockchain) and began selling names on these domains to the public for thousands of dollars, managing it all from their private blockchain that only they control, unlike the original blockchain which was a public project and available for participation in by all.

Your client marketed their .wallet as being in a completely different ecosystem from mine in order to gain public acceptance. I concur that the two .wallet's exist in completely different ecosystems.

In July of 2022, we legally and rightfully began allocating names on our .wallet domain (in the Handshake ecosystem) for $1.99. I understand why your client would be upset at the prospect of being revealed as a price gouging fraud. It was our intent to always allow the underprivileged and less fortunate "netizens" to acquire an identity on the blockchain (the real blockchain) for as low of a cost as possible. I requested the registrar to give names away for free, but the registrar explained that there are minimal costs that need to be recovered, such as managing the infrastructure on the back end. Consequently, I requested the registrar (gateway.io) to price domain at cost to them, and that I would receive absolutely no revenue whatsoever from any sales.

During the entire period of time that I described above, it was never my intent to prevent your client from infringing on my intellectual property. My feeling was: 1) they are two different ecosystems with different functionalities. 2) Others (throughout the world) are going to try to deploy their own versions of .wallet, and being a completely decentralized technology it would be impossible to mitigate. 3) In the end, the market will decide and eventually determine your client to be a fraud. 4) Your client had every right to bid on and acquire the real .wallet domain (that I have) and was not interested.

Should your client decide to pursue this issue, there are factors they should consider: 1) an intellectual property countersuit is on the table, and I believe I can easily prove disingenuous and malicious intent. 2) I would like to subpoena the internal communications of past employees working at Unstoppable Domains that would testify that your client knew they were engaging in questionable (at best) or malicious (at worst) behaviors with respect to their methodology for choosing domains to copy and re-sell. 3) I would like to discover the income your client has made around the sales of names to their .wallet domain. 4) Your client launched sales of multiple domains knowing they were competing with domains that had been mined and minted to the blockchain already by other parties 5) I find your claim to be frivolous, and that you are knowingly engaging as a party to a complaint that you yourself know they have no chance of winning, and I will seek to have you disbarred. 6) You should ask your client, what will be the damage to their company when they lose such a case, which you are well aware they surely will.

I seriously advise you to suggest to your client to drop it, and go back to running their business, which I have no intentions of hampering.

You may also correspond with me at this email address. I do not see what the point is of involving a registrar, other than you are not a technical person and lack knowledge in the workings of the ecosystems that I have described

above. Your client failed to explain many things to you. I strongly suggest that you sit your client down and ask them to explain the full story to you, as opposed to swiping their corporate visa card for $99. You should educate yourself in blockchains, decentralization, minting, non-fungible tokens, and prior precedents such as Nissan vs Nissan.

If after such education, you or your client wish to have a cordial conversation where we might look for ways to collaborate (such as a wallet that can send tokens from a .wallet on one chain to a .wallet on another chain), then that would be a conversation I could engage in.

Let it go. Do not confuse my kindness for weakness.